Argued October 14, affirmed November 29, 1921, objections to cost
bill overruled February 14, 1922.

# LEADBETTER v. PRICE.

(202 Pac. 104.)

**Frauds, Statute of—Verbal Option to Purchase Stock Held Within
Statute of Frauds.**

1. Verbal options alleged to have been given plaintiff to pur-
chase stocks obtained by deceased direct from the corporation *held*
void under Section 808, subdivision 5, Or. L., for want of writ-
ten memorandum, absence of part performance, and nonpayment by
plaintiff of any part of the purchase money.

**Frauds, Statute of—Verbal Options to Repurchase Stock Held not
Within Statute.**

2. Verbal options to repurchase stock, if given, as claimed, at
the time of the purchase of the stock from the optionee by the
optionor, were based on a consideration and part performance and
not within the statute.

**Corporations—Option to Repurchase Stock not Revocable During
Time for Election.**

3. Options given to a seller of stock to repurchase it could not
be withdrawn during the time within which the seller had a right
to elect whether he would repurchase.

**Specific Performance — Clear Proof of Verbal Contract Necessary
Where Alleged Promisor is Dead.**

4. When a contract rests wholly in parol and the alleged promisor
is dead, clear and satisfactory proof of the terms of the agreement
and its strict performance by the promisee is required before specific
performance of the contract will be granted.

**Specific Performance—Preponderance of Proof Insufficient for the
Specific Performance of a Parol Contract When Existence is
Denied.**

5. Where a proceeding is brought for the specific performance of
a parol contract, more than a preponderance of evidence is required
to establish the existence of such parol contract when its existence
is denied.

**Specific Performance—Parol Contract for the Sale of Stock not Es-
tablished by Degree of Proof Required for Specific Performance.**

6. In action for specific performance of alleged parol contracts
for the sale of stock wherein the promisor is dead and his executor
denies such contract, *held*, that the contracts are not established by
the degree of proof.

**Sales — To Turn Option Contract into Unconditional Contract,
Optionee must Make Timely Election to Buy.**

7. To turn an option contract into a contract binding one to sell
and the other to buy, it is incumbent on the buyer to make a timely

election, and the election must unconditionally conform to the terms of the offer contained in the option.

**Sales—By Election Under Option Contract, a Specifically Enforceable Executory Contract Results.**

8. Where optionee has made an election under an option agreement, within the time limited thereby, or by law, where no time limit is fixed, an executory contract of sale results which is enforceable; but mere notice of an intention on the part of the optionee to purchase is insufficient unless there is payment or offer of payment.

**Specific . Performance — Complaint Held Insufficient in Action for Specific Performance of Stock Contract.**

9. In action for specific performance of an option contract for the sale of corporate stocks, the complaint is insufficient when not showing an acceptance of the offer in the option with an unconditional offer to presently pay the purchase price by the optionee.

**Corporations—In Option Contracts for the Purchase of Stock Silent as to Time of Performance, Election must be Within Reasonable Time.**

10. Where an option contract for the purchase of stock does not fix the time which the option privilege is to run, the law fixes a reasonable time within which election must be made, and election to buy with full tender after the expiration of a reasonable time does not change the legal rights of the parties.

**Corporations—In Option Contracts for Purchase of Stock, "Reasonable Time" to Buy Determined from Facts and Circumstances.**

11. In an option contract for the purchase of corporate stock which is silent as to date of purchase, a "reasonable time" within which the optionee must make election to buy is to be determined from all the facts and circumstances.

**Corporations—Nine Years Held Unreasonable Time for Option to Buy Stock.**

12. Under an option to purchase stock, in which the optionor was 75 years old, *held,* that an election by optionee after nine years was not within a reasonable time.

From Multnomah: ROBERT TUCKER, Judge.

Department 2.

This suit is brought by appellant Leadbetter against O. L. Price, the executor of the last will and testament of H. L. Pittock, deceased, to enforce an alleged right, which appellant claims, to purchase all of certain corporate stock belonging to and listed among the assets of the estate of the deceased. Appellant

appeals from the decree of the Circuit Court dismissing his complaint.                                    AFFIRMED.

For appellant there was a brief over the name of *Messrs. Cake & Cake,* with an oral argument by *Mr. L: A. Liljeqvist.*

For respondent there was a brief over the name of *Mr. D. L. Price,* with oral arguments by *Mr. Charles H. Carey* and *Mr. James B. Kerr.*

McCOURT, J.—At the time of his death, January 28, 1919, Pittock owned 4,400 shares of the capital stock of the Crown-Columbia Pulp & Paper Co., now Crown-Columbia Paper Co., and 8,592 shares of the preferred stock of the Crown-Willamette Paper Co. The aforesaid stock was appraised in the inventory of Pittock's estate at $1,045,640. Pittock acquired the stock on and between April 1, 1910, and May 1, 1917, in blocks and at prices as follows:

| | | | |
|---|---|---|---|
| April | 1, 1910. | 2000 shares of the common stock of the Crown-Columbia Pulp & Paper Co., purchased from Leadbetter, at $150 per share.................. | $300,000 |
| July | 6, 1910. | 1000 shares of increased capital stock of the Crown-Columbia Pulp & Paper Co., subscribed for and purchased direct from corporation, at $100 per share ................. | $100,000 |
| July | 24, 1912. | 450 shares increased capital stock of Crown-Columbia Pulp & Paper Co., subscribed for and purchased direct from corporation, at $100 per share. | $ 45,000 |
| May | 24, 1913. | 500 shares common stock of Crown-Columbia Pulp & Paper Co., purchased from Leadbetter, at $200 per share ...................... | $100,000 |
| August | 24, 1914. | 450 shares common stock of Crown-Columbia Pulp & Paper Co., purchased from Leadbetter, at $200 per share ...................... | $ 90,000 |
| Nov. | —, 1914. | 1760 shares "A" preferred stock of Crown-Willamette Paper Co., received as a stock dividend........ | Nothing paid. |

Nov.  —, 1914.  3520 shares "B" preferred stock of
                Crown-Willamette Paper Co., re-
                ceived as stock dividend........Nothing paid.
—————, 1916.    1056 shares second preferred stock
                of Crown-Willamette Paper Co.,
                received as a stock dividend....Nothing paid.
April  30, 1917.  1056 shares second preferred stock of
                Crown-Willamette Paper Co., re-
                ceived as a stock dividend......Nothing paid.
May    1, 1917.   1200 shares first preferred stock of
                Crown-Willamette Paper Co., pur-
                chased from F. W. Leadbetter, at
                $100 per share ......................$120,000

Leadbetter alleges in his complaint and testified as a witness in his own behalf that upon each occasion that Pittock acquired the above-mentioned stock, including dividend stock and purchases direct from the corporation, he, Pittock, at the solicitation of Leadbetter, orally agreed that Leadbetter might purchase or repurchase the stock acquired upon that date, upon the payment to Pittock of the sum of money paid by Pittock therefor, together with interest on such sum at the rate of 6 per cent per annum to the time Leadbetter should exercise his option, and further that on each occasion after the first, Pittock reiterated and renewed the option or options previously given. That Pittock, on April 1, 1910, gave Leadbetter an oral option to repurchase the stock acquired by Pittock on that date is established by the evidence. The testimony of defendant Price corroborates Leadbetter to the extent that an option to repurchase was given. The latter testified: "Mr. Pittock said he thought he paid too much for it,. and as I remember Mr. Leadbetter says, 'I want the privilege of rebuying this stock at the price that I am paying you.' Mr. Pittock said, 'All right, you give me back the money that I paid you and six per cent interest and you can have it.' " At another place in his testimony, Price restated the incident as follows: "Mr. Leadbetter

103 Or.—15

said I want the privilege of repurchasing this stock at the price at which I am selling it to you. Mr. Pittock said with some emphasis 'All right; you pay me back what I paid you and 6 per cent interest and you can have it.'" Price also testified that Pittock on two occasions between April 1, 1910, and November 9, 1912, mentioned the matter of the option. On the first occasion he asked Price how long Leadbetter would have to exercise his option, and upon being informed that he would have a reasonable time, Pittock inquired what would be a reasonable time in such a case; and on the second occasion, which was about November 9, 1912, Pittock referred to a contract executed by himself and Leadbetter on that day, and observed that to his mind, Leadbetter's idea of a reasonable time in such a transaction was two years.

As to those options to purchase stock alleged to have been given after 1910, appellant relies upon his own declaration to prove the same, unaided by detail of corroborating fact or circumstance. The evidence discloses that neither Pittock nor Leadbetter ever made any written reference to, or note or memorandum, private or otherwise, of the option agreements in question, or any of them; and that, except the agreement of April 1, 1910, no third person was present at any of the times the option agreements between Pittock and Leadbetter are claimed by the latter to have been made. Leadbetter took no action of any kind while Pittock lived looking to the exercise of any of the rights he is attempting to establish and assert in this suit, and Pittock did not call upon him to do so.

The respondent insists that the evidence failed to establish that Pittock at any time after April 1, 1910, gave any of the options to purchase stock relied upon by Leadbetter. Respondent also contends that all

the option agreements in question are void under the statute of frauds, and further that appellant's case must fail because the evidence shows beyond controversy that Leadbetter at no time made an election (timely or otherwise) to buy under the option of April 1, 1910, or under any of the subsequent options upon which he relies.

1, 2. The alleged options to purchase the stock that Pittock obtained direct from the corporation on July 6, 1910, and July 24, 1912, are void under the statute of frauds, subdivision 5, Section 808, Or. L., for want of a written memorandum, the absence of part performance and nonpayment by Leadbetter of any part of the purchase money. For the same reason the alleged options for the purchase of dividend stock are void, unless the right to purchase the same was included in the option given April 1, 1910. The remaining transactions, if made under the circumstances testified to by Leadbetter, each constituted an option to repurchase stock, based upon a consideration and part performance, and therefore are not within the statute of frauds.

Appellant's suit apparently proceeds upon the theory that the several alleged option agreements constitute one option for the repurchase of the stock described, and that the institution of the suit constituted an election to purchase under said option contract, and thereby supplied the mutuality of right and remedy essential to the maintenance of a suit for specific performance. The relief asked is that the sum of money due under said verbal contract be determined and a decree made declaring that the appellant within one year from the date of such decree, or such other time as shall be fixed by the court, may pay to the executor the sum of money so found to be due, and that

upon the payment of such money, the executor be required to transfer and deliver to appellant the shares of stock, including stock dividends above mentioned.

3, 4. Such options, if given, could not be withdrawn by Pittock during the time within which Leadbetter had the right to elect whether or not he would repurchase the stock. No time limit was fixed by any such option agreements, and therefore Leadbetter had a reasonable time, after the respective dates thereof, to make his election: *Mossie* v. *Cyrus,* 61 Or. 17 (119 Pac. 485); James on Option Contracts, § 707.

When a contract rests wholly in parol, and the alleged promisor is dead, clear and satisfactory proof of the terms of the agreement and its strict performance by the promisee is required before specific performance of such contract will be granted: *Herr* v. *McAllister,* 92 Or. 581 (181 Pac. 741); *Riggs* v. *Adkins,* 95 Or. 414 (187 Pac. 303); *Hawkins* v. *Doe,* 60 Or. 437, 441 (119 Pac. 754, Ann. Cas. 1917A, 765); *Wagonblast* v. *Whitney,* 12 Or. 83 (6 Pac. 399); *Odell* v. *Morin,* 5 Or. 96.

The appellant, Leadbetter, and Pittock, now deceased, sustained the relation of son-in-law and father-in-law, and their business and social relations were intimate. Pittock was a very exacting and careful business man. He gave personal attention to the smallest details and personally kept an accurate record thereof, although he had many large interests, as shown by the fact that his estate was appraised at more than $11,000,000. It is conceded that he performed all of his agreements punctually and precisely as made—that his word was as good as his bond.

Also that he exacted full and prompt performance of contract obligations in his favor.

Leadbetter, likewise, is a capable and successful business man, but does not give the attention to details that was characteristic of Pittock. Besides being jointly interested in many ventures, Pittock and Leadbetter each had large holdings in which the other was not interested. Title to much of their joint property was taken in the name of Leadbetter, and he was allowed a free hand in acquiring and disposing of such property.

Prior to 1910, Leadbetter had developed a large paper manufacturing industry; his interest therein was represented by a holding of 4,000 shares, par value $100 each, representing 40 per cent of the capital stock of the Crown-Columbia Pulp Paper Co., a corporation, one half of which he transferred to Pittock April 1, 1910, as above stated. This stock paid regular dividends amounting to $12 per annum upon each share of stock, or 6 per cent per annum on a valuation of $200 per share. Shortly after April 1, 1910, the name of the Crown-Columbia Pulp & Paper Co. was changed to Crown-Columbia Paper Co., and in 1914 its physical properties and assets were conveyed and transferred to the Crown-Willamette Paper Co., which thereafter operated the paper manufacturing plants. Thereafter the principal assets of the Crown-Columbia Paper Co. consisted of one half of the capital stock of the Crown-Willamette Paper Co.

Pittock controlled ''The Oregonian,'' which was a heavy purchaser of paper, and for that reason he had, prior to April 1, 1910, avoided investment in that or any other paper manufacturing concern. However, he held one share of stock in the Crown-Columbia Pulp & Paper Co., which had been furnished him by Leadbetter, so that he could qualify as a director of

the concern. Later Pittock appeared to value this stock highly as an investment.

Pittock, because of his greater financial ability, was able to, and frequently did, advance large sums of money in connection with the acquisition of property by Leadbetter for their joint benefit. At frequent intervals up to July 1, 1917, settlements were had, when their mutual claims against each other were adjusted and paid either by cash or by transfer of property, or by both, and such evidences of indebtedness as might have been given by one to the other were canceled and surrendered. Each of the option agreements in suit is claimed to have been given in connection with and upon the occasion of one of these periodical settlements.

The conduct of Pittock after December 1, 1912, in reference to the stock in question was inconsistent with the option agreements claimed to have been made after that date and with the continuance of any option given prior thereto. The continuance of the option agreement of April 1, 1910, and of those alleged to have been later given, and the creation of like option agreements subsequent to that date are directly at variance with Pittock's course of business conduct in such matters. Pittock did not allow business matters to drag or remain in uncertainty. He acknowledged his own contract obligations fully and met them promptly.

On December 23, 1912, shortly after he had indicated that he thought Leadbetter had enjoyed a reasonable time to elect to buy the stock under the option of April 1, 1910, Pittock pledged the stock held by him as security for a large loan. Between April 1, 1910, and his death, Pittock collected cash dividends upon the stock in question, amounting to $333,316,

without accounting for any thereof to Leadbetter, and during the same period, without consulting Leadbetter, or calling upon him in any way, he paid besides the usual taxes thereon, federal income taxes amounting to $68,537.13. Pittock paid fair value for the stock, and altogether the sum of $755,000. Nearly one-half million dollars of this latter sum was paid during a period when Pittock's financial burdens were heavy, and while he was compelled to borrow nearly a million dollars to carry the same. If Leadbetter was entitled to the stock dividends received by Pittock in 1914, as he claims, the same had more than a sufficient value to have effected the purchase that Leadbetter claims he at that time had a right to make. Leadbetter explains that his failure to repurchase the stock at that time arose out of his desire to keep the stock intact so that he might exercise the right to a voice in the directorate of the corporation in the proportion given him by a certain contract made at the time the corporation was formed. The force of the explanation is impaired by his failure to make any effort to exercise the right mentioned from April 1, 1910, to the time of Pittock's death, and particularly in view of the fact that in the interval the corporation conducted many important corporate transactions. Among these, it increased its capital stock, ceased to manufacture paper and conveyed its physical assets to the Crown-Willamette Paper Co., which thereafter conducted the manufacture of paper in which it was interested.

All the sales of stock made by Leadbetter to Pittock were made in connection with the settlement and adjustment of indebtedness and property rights between Pittock and Leadbetter. And in each instance Pittock calculated interest to the exact date and required the

payment thereof and took into account and adjusted accrued dividends on the stock. At the time of the sale of August 24, 1914, Pittock required Leadbetter to execute and deliver to him deeds recognizing Pittock's interest in properties, the record titles to which were in Leadbetter. Recognition of Pittock's interest in these properties seems to have been the only purpose of such deeds; they were merely held by Pittock and not recorded for several years. It seems that this requirement should have removed any delicacy Leadbetter might have felt about requesting Pittock to put the option agreement or agreements in written form. About this time, at Pittock's request, Leadbetter made a list of Pittock's property holdings and placed opposite each item of property his estimate of the value thereof. This list was made for use by Pittock in obtaining a large loan; Leadbetter included therein 4,400 shares of Crown-Columbia Paper Co. stock (Pittock's entire holdings at the time) and placed a value thereon of $880,000. Leadbetter was aware that Pittock had used, and intended to use, the stock as collateral security for loans which he had obtained, and intended to obtain from sundry banks throughout the United States.

On August 23, 1916, Pittock, then being eighty-one years of age, made and published his last will and testament, wherein it was provided: "C. None of my stock in the Crown-Willamette Paper Co. shall be sold, but shall be held intact during the entire period of this trust." The trust period provided by the will was twenty years, and the evidence shows that Pittock designated both the stock in the Crown-Willamette Paper Co. and the stock in the Crown-Columbia Paper Co. as Crown-Willamette Paper Co. stock. Pittock personally kept a detailed record of the fore-

going stock transactions, and under date of July 21, 1917, he placed the stock in a separate package, and made an indorsement thereon designating them as his holdings.  Nowhere in the books of entry or record or memoranda kept and made by Pittock did he indicate that his title to or interest in the stock was subject to the right of Leadbetter, to purchase the same, or that his title was subject to any qualification whatever.  When Leadbetter was absent from Portland, which was frequently, correspondence was had between Pittock and Leadbetter, but no reference was made in the correspondence of either of them to a right in Leadbetter to repurchase the stock.  It should be observed that the defendant, O. L. Price, from 1907 to the time of the death of Pittock, acted as private secretary and bookkeeper for both Pittock and Leadbetter, and that he was present, part of the time at least, during most, if not all, of the transactions had between Pittock and Leadbetter concerning the stock in question.  Price testified that he had no knowledge of any option given by Pittock to Leadbetter, except that of April 1, 1910, as above recited.

5, 6. Where a proceeding is brought for the specific performance of a parol contract, more than a mere preponderance of testimony is required to establish the existence of such parol contract when its existence is denied: 25 R. C. L. 339; 6 Pomeroy's Equity, § 765; *Coff* v. *Kelsey*, 78 Or. 337 (153 Pac. 103).

Payment by Leadbetter of large sums of money within reasonable time limits was essential to the perfection of the rights asserted in this suit.  The amounts involved and the character of the contracts called for diligence.  The entire absence of any offer by Leadbetter to pay any such sums and of any effort

to do so, together with the failure while Pittock lived, to do any act or give any expression indicating an intention to exercise the alleged rights to repurchase the stock, raises a grave question of the existence of any option agreement subsequent to April 1, 1910, and this question becomes a positive doubt in view of the conduct of Pittock pursued throughout the entire period, wholly at variance with the existence of such agreements. It was wholly unlike Pittock to give successive options of the same character when previous like options to the same person had not been exercised. Leadbetter and Pittock transacted all their extensive business with each other in a business-like manner; but these later option agreements, if made, constitute an exception to their whole course of business conduct. They are each said to be part of a larger transaction that it is admitted was conducted with the usual strict business practices of the parties. In this state of the evidence, a court of equity cannot say that the existence of the option agreements, alleged to have been made subsequent to April 1, 1910, is established by that degree of proof required in cases where specific performance of a parol contract is sought.

7. To turn the option contract of April 1, 1910, into a contract binding Pittock to sell and Leadbetter to buy, it was incumbent upon Leadbetter to make a timely election to buy: James on Option Contracts, §§ 801, 813; *Pollock* v. *Brookover*, 60 W. Va. 75 (53 S. E. 795, 6 L. R. A. (N. S.) 403, and case note).

Election by the optionee must strictly conform to the terms of the offer contained in the option and must be unequivocal, absolute and unconditional: *Friendly* v. *Elwert,* 57 Or. 599, 610 (105 Pac. 404, 111 Pac. 690, 112 Pac. 1085, Ann. Cas. 1913A, 357); James on Options, § 837.

8. It is only after the optionee has made an election under the terms of the option agreement, and within the time limited thereby, or by the law, where no time limit is fixed by the agreement, that an executory contract of sale results, of which a court of equity will require the specific performance.

The particular act or acts which constitute an election may be fixed by the terms of the option, such as payment of the price, in which case payment of the price is made a condition precedent to the exercise of the right to buy, and the money must be paid or tendered, and a mere notice of intention to buy, or that the optionee will take the property does not change the relation of the parties and does not raise a binding promise upon the part of the optionor: *Clarno* v. *Grayson,* 30 Or. 111 142 (46 Pac. 426); *Kingsley* v. *Kressly,* 60 Or. 167, 173 (111 Pac. 385, 118 Pac. 678, Ann. Cas. 1913E, 746); *Davis* v. *Brigham,* 56 Or. 41, 47 (107 Pac. 961, Ann. Cas. 1912B, 1340); *Killough* v. *Lee,* 2 Tex. Civ. App. 260 (21 S. W. 970); *Winders* v. *Kenan,* 161 N. C. 628 (77 S. E. 687); James on Option Contracts, §§ 816, 817, 914, 924.

9. Mere notice by Leadbetter of a willingness or desire to purchase the stock did not convert the option agreement into a contract of sale. The option agreement was given in response to the expression of such desire and willingness and the request for the privilege of purchasing stock, and the same was granted upon the express and only condition that the amount of money paid therefor, with interest, be repaid to Pittock. Payment or tender of payment was the only act required to, or that could, convert the option into a binding contract of sale.

It follows that payment of the purchase money was a condition precedent to a binding contract of sale

and constituted the one act that would constitute an election and effect such a contract. Neither payment nor offer of payment was made to the executor of Pittock's estate. Indeed, no notice was given by Leadbetter positively accepting the terms of the option agreement, either with or without the showing of ability to pay the purchase price essential in such a case. It is insisted that defendant had refused to recognize any right in Leadbetter to buy the stock, and that an offer of payment would have been idle, and that therefore the institution of suit, as has been held in some cases, constituted an acceptance or election to buy and supplied the want of mutuality that otherwise would exist: 25 R. C. L. 235; 6 Pom. Eq. Jur., § 773; note to *Cummins* v. *Beavers,* 1 Ann. Cas. 990.

It is manifest, however, that before the institution of a suit would have the effect claimed, the complaint must by its allegations express an unqualified and unequivocal acceptance of the offer contained in the option, together with a direct and unconditional offer to presently pay the purchase price: *Clarno* v. *Grayson,* 30 Or. 111, 142 (46 Pac. 426).

Appellant's complaint falls short of these requirements; therein appellant does not disclose a desire to purchase presently, but at some future time that may be designated by the court and within one year after the entry of the decree. This is clearly insufficient.

10. Although the foregoing considerations are decisive of the case, notice will be taken of an additional obstacle to appellant's right to prevail in this suit.

Where an option contract does not expressly fix the time which the option privilege is to run, the law fixes a reasonable time, and the election must be made within such time: James on Option Contracts, § 856;

*Mossie* v. *Cyrus,* 61 Or. 17, 20 (119 Pac. 485, 119 Pac. 624).

In the case of *Mossie* v. *Cyrus,* at p. 20 of the opinion, Mr. Justice EAKIN, speaking for the court, said:

"And if the acceptance is not made within a reasonable time, the option is terminated and without notice to the vendee of a withdrawal."

No rights are acquired by an election made after the time limit of an option has expired. Election to buy under an option agreement, with full tender of performance after the expiration of a reasonable time to make such election, does not change the legal rights of the parties: *Bowen* v. *McCarthy,* 85 Mich. 26 (48 N. W. 155).

11. What is a reasonable time within which the optionee must make an election where the option is silent is to be determined from all the facts and circumstances shown by the evidence.

"The inquiry resolves itself into an investigation as to what time it is rational to suppose the parties contemplated, and the law will decide this to be that time which as rational men they ought to have understood each other to have had in mind. Or, as said in another case, such time as is necessarily convenient to do what the contract required to be done." James on Option Contracts, § 857; *Larmon* v. *Jordan,* 56 Ill. 204; *Hollis* v. *Libbey,* 101 Me. 302 (64 Atl. 621).

12. The cases relating to option contracts for the purchase of corporate stock disclose that courts are inclined to measure a reasonable time for the exercise of such options by months rather than years. It is certain that on April 1, 1910, it was not contemplated by the parties that Leadbetter should have nine years, or anything like that length of time within which to elect whether he would buy the stock. Pittock then

was seventy-five years of age and his expectancy of life and of continued business capacity was short.

Leadbetter asserts that as an incident to the stock he possessed the right to name a number of the directors of the corporation sufficient to give him an influence on the board, proportionate to his stock holding. To preserve and enjoy that right, it was essential that he hold the stock at the annual meetings of the stockholders. This circumstance in the absence of special agreement, fixing a later time for acceptance would indicate that the parties contemplated the time of election as not later than the next annual meeting of the stockholders of the corporation. It is urged that a longer time was within the contemplation of the parties, owing to their close social and business relations, but it appears that Pittock held Leadbetter to strict business accountability in all their other business matters; and again it is said that it was expected by both Pittock and Leadbetter that the latter would secure the money to repurchase the stock from the proceeds of sales of properties in which they were jointly interested. In this connection it appears that the properties they had in mind were on the market, and that negotiations had been carried on for their sale, and that prospects of sale were in view. Ordinarily a year's time would be sufficient to make such sales, and in any event, two years would be the limit of time that the parties could have had in mind for consummating the same.

Under the facts and circumstances in evidence, Leadbetter's time for election expired and the option agreement of April 1, 1910, lapsed long before Pittock's death. The reiteration of the option from time to time, as claimed by Leadbetter, would not have the effect of extending the time for election, unless

made under circumstances raising an estoppel or amounting to waiver, which does not appear in this case. Such renewals, if made, were without consideration and not in writing, and were therefore not enforceable; they terminated upon the death of Pittock: James on Option Contracts, §§ 706–709.

What is herein stated as essential to an election under the option of 1910, and as constituting a reasonable time for exercising the same, applies to the subsequent option agreements set out in appellant's complaint.

Appellant having failed to make a timely election to buy under the option of April 1, 1910, and having failed to establish the existence of the subsequent option agreements relied upon by him, with the certainty required to authorize a court of equity to grant specific performance, his appeal must fail. The decree of the Circuit Court is therefore affirmed.

AFFIRMED.    OBJECTIONS TO COST BILL OVERRULED.

BEAN, J., concurs.

BURNETT, C. J., concurs in the result.

BROWN, J., took no part in the decision.