J. Michael O'BRIEN and Paula K. Lewis, Plaintiffs and Appellees,

v.

R–J DEVELOPMENT CORPORATION, a corporation, and Emma D. Richards, Defendants and Appellants.

Nos. 15066, 15078.

Supreme Court of South Dakota.

Argued Jan. 15, 1986.

Decided May 14, 1986.

Rehearing Granted June 24, 1986.

James H. Wilson of Wilson, Olson, Goodsell & Nash, P.C., Rapid City, for plaintiffs and appellees.

Robert W. Gunderson of Gunderson, Farrar, Aldrich & DeMersseman, Rapid City, for defendants and appellants.

HENDERSON, Justice.

### ACTION

This appeal is taken from a complicated Judgment and Decree of Specific Performance which enforces a contract to sell real estate. We affirm in part, reverse in part,

and remand for entry of judgment consistent with our ruling herein. *See Conclusion, infra.*

## PARTIES

Appellants-defendants are Emma D. Richards (Richards), and R–J Development Corporation (R–J Development). Richards is the president, major stockholder, and a member of the Board of Directors of R–J Development.

Appellees-plaintiffs are J. Michael O'Brien (O'Brien), and Paula K. Lewis (Lewis). O'Brien and Lewis are Rapid City real estate brokers and are associated with the Rapid City real estate firm of Lewis & Kirkeby Real Estate, Inc.

## FACTS

In February 1983, Lewis, on behalf of Lewis & Kirkeby Real Estate, Inc., entered into a Multiple Listing Agreement with Richards and R–J Development whereby Lewis and her firm had an exclusive listing to market Trailwood Village real estate. Trailwood Village is a subdivision east of Rapid City. Some of this property is held by Richards individually and some is held in the name of R–J Development. This Listing Agreement ran from February 5, 1983, until October 5, 1983.

Marketing the Trailwood Village property, however, proved to be difficult. No lots had been sold since 1981, there were ill feelings between the homeowners and Richards, and there were problems with the subdivision's sewer line. It appears that the sewer line would not lamp, i.e., when a lamp or lantern was held at one end, the light could not be seen at the other end. This indicated a sinking or crushing of the sewer line. These sewer problems caused a loss of FHA and VA financing and the Rapid Valley Sanitary District refused to approve further construction until the sewer was fixed. A bid estimated the repairs as costing $39,788. Richards, Lewis, and Richards' attorney, Robert W. Gunderson, pursued various avenues for eliminating these problems.

During the Summer of 1983, Richards indicated to Lewis that she did not want to spend the money or undertake the physical responsibility of developing the subdivision so as to make the lots saleable. At her age, she believed she did not have the physical strength to finish the project. On several occasions, Richards and Attorney Gunderson suggested that Lewis purchase the Trailwood Village property. Lewis ran this idea/proposal past Lewis & Kirkeby Real Estate, Inc., and when the firm declined the proposition, Lewis approached O'Brien.

Lewis and O'Brien evaluated the property and prepared an Offer and Agreement to Purchase. On September 23, 1983, Lewis and O'Brien presented their Offer and Agreement to Purchase to Richards. The three met at Richards' home and discussed various aspects of the document and proposed sale. At this time, Lewis and O'Brien also suggested that Richards go over it with Attorney Gunderson. On September 26 or 27, 1983, Lewis, O'Brien, and Richards met at Attorney Gunderson's office and discussed the terms of the offer. On September 30, 1983, the parties again met at Attorney Gunderson's office. At this meeting, an Offer and Agreement to Purchase was presented by Richards to Lewis and O'Brien. This document, which was prepared by Attorney Gunderson, was nearly identical to the Lewis and O'Brien Offer and Agreement to Purchase except the selling price of the lots had been raised. Lewis and O'Brien rejected a price increase and after some discussion, it appeared the parties had agreed to return to the original price and Attorney Gunderson would then prepare an Offer and Agreement to Purchase which everyone could sign.

On October 3, 1983, Lewis and O'Brien received the newly prepared Offer and Agreement to Purchase—the document at the center of this litigation. It embodies eight typewritten pages with detailed provisions of the parties' obligations. It was a far cry from a short, standard form. When received by Lewis and O'Brien, this document had already been signed by Richards. After examination thereof, Lewis

and O'Brien affixed their signatures thereto and returned the same to Attorney Gunderson's office. This October 3, 1983, Offer and Agreement to Purchase provided for the sale and purchase of 22 Trailwood Village lots and also provided three options for the future purchase and sale of additional Trailwood Village lots and undeveloped acreage. Under its terms, a $45,000 down payment was to be escrowed and used to make necessary improvements on the sewer line. Lewis and O'Brien were to negotiate these sewer corrections. They further agreed to withstand a reasonable cost overrun or increase in the cost of these repairs, over and above the down payment, with such cost overruns to be deducted from the price of the lots.

On October 3, 1983, Attorney Gunderson also had a letter and a copy of this Offer and Agreement to Purchase delivered to Attorney James W. Olson, who Lewis and O'Brien had indicated would act as their counsel. In this letter, Attorney Gunderson advised Attorney Olson as follows:

> Your clients have told me that you would be apprised of the situation by this time. I am out of town, but I'm having hand delivered to you what I hope will be the last draft of an Offer and Agreement to Purchase so you can advise your clients about it. If everything seems satisfactory they can sign it and start to fix that sewer and you and I can get together and draw the contracts for deed and the options and whatever else has to be done to put this matter to bed.

Lewis and O'Brien thereafter deposited earnest money and arranged financing with First Western Federal Savings and Loan Association and the South Dakota Housing Development Authority. Attorney Olson also prepared a rough draft of a Contract for Deed and delivered it to Attorney Gunderson's office. On December 14, 1983, the parties and counsel met in Attorney Gunderson's office. At this time, Richards informed Lewis and O'Brien that she would not sell at the price agreed upon. This turnabout was apparently precipitated by Richards' relatives' views that the selling price was inadequate. Lewis and O'Brien refused to agree to a higher price and the next day, December 15, 1983, Attorney Gunderson informed Attorney Olson that Richards was not going to perform the agreement. Thereafter, Lewis and O'Brien tendered performance. There was no objection to the form of tender.

In February 1984, Lewis and O'Brien commenced the present action praying for specific performance, costs, and fees. Richards and R–J Development answered by denying that the October 3, 1983, Offer and Agreement to Purchase was a final contract, and counterclaimed to quiet title and recover damages resulting from Lewis' and O'Brien's alleged violations of their duties as professional real estate agents. After the filing of the suit herein, Richards and R–J Development unilaterally arranged for and procured sewer repairs which ultimately cost $71,182.36.

A bench trial was conducted. Lewis, O'Brien, and Richards were the only witnesses called and examined. The trial court found the October 3, 1983, Offer and Agreement to Purchase to be a firm and complete agreement or contract and that the parties therein agreed to enter into subsequent paper work necessary to the incidental execution of the contract and that a party could not unreasonably withhold approval of the final documents necessary to consummate the transfer of the property. The trial court further found the contract not to be unreasonable, unfair, or unconscionable and found there was no violation of a fiduciary responsibility on the part of Lewis and O'Brien toward Richards and R–J Development. The trial court also assessed $21,182.36 of the sewer repairs to be added to the purchase price; found no damages for any of the parties; denied an award of attorney fees; decreed specific performance; and, in its conclusions of law, the trial court settled the boilerplate provisions of a contract for deed.

From the entire Judgment and Decree of Specific Performance, Richards and R–J Development now appeal. From the trial court's addition of $21,182.36 to the pur-

chase price, the denial of damages, and the denial of attorney fees, Lewis and O'Brien have filed a Notice of Review.

## DECISION

### I.

DID THE PARTIES INTEND THE OF-FER AND AGREEMENT TO PUR-CHASE OF OCTOBER 3, 1983, TO BE A FINAL AND LEGALLY BINDING DOCUMENT? WE HOLD THAT THEY DID.

■ A trial court's findings in a specific performance action will not be disturbed on appeal unless they are clearly erroneous. *Wiggins v. Shewmake*, 374 N.W.2d 111, 114 (S.D.1985). *See also*, SDCL 15-6-52(a).

In its findings of fact, the trial court found the Offer and Agreement to Purchase of October 3, 1983, was voluntarily signed and delivered and within its four corners, it established a meeting of the minds and that a complete agreement was reached by all the parties. It further found that the language "[t]his is a prelimi-nary offer to purchase[,]" meant that all parties shall enter into subsequent paper work necessary to the incidental execution of the contract and that a party could not unreasonably withhold approval of the final document necessary to consummate the transfer of property.

■ Recently, we upheld a trial court's award of specific performance which was based in part upon a purchase agreement. *Wiggins*. After a review of the entire record, we are not left with a definite and firm conviction that under the facts and circumstances herein, the trial court erred in determining that the document in ques-tion was a firm and complete agreement.

Lewis' and O'Brien's testimony supports the findings outlined above as does the wording of the Offer and Agreement to Purchase. Language therein includes such phrases as "Seller agrees to sell and the Buyers agree to buy ...," "[t]he terms of the purchase are ...," "[s]aid contract for deed shall provide ...," "[i]n addition to

the above agreed sale and purchase of lots ...," "during the term of the contract ...," "the contract for deed shall be ...," "the contracts agreed to be entered into herein ...," "[t]he Buyers ... agree that they are buying all of said lots 'as is'," "in this contract," "concerning the matters agreed to herein," and "Seller shall have the option to sue for specific perform-ance...." The letter written by Attorney Gunderson to Attorney Olson, which was admitted into evidence, which pertinent lan-guage is quoted above, also supports the finding that the parties reached a final and complete agreement. Lewis' and O'Brien's actions, after signing the Offer and Agree-ment to Purchase, further support this con-clusion. Acting in reliance upon the agree-ment, Lewis and O'Brien procured financ-ing for their obligations and for building houses. Richards' relatives, however, thought it was inadequate consideration. Richards then tried to back out. We can-not condone her decision.

### II.

RICHARDS CONTENDS LEWIS AND O'BRIEN VIOLATED A FIDUCIARY OBLIGATION UNTO HERSELF AND R-J DEVELOPMENT. WE HOLD OTHERWISE.

At the time of the signing of the October 3, 1983, Offer and Agreement to Purchase, the February 1983 Listing Agreement be-tween Richards, R-J Development, and Lewis & Kirkeby Real Estate, Inc., was still in effect and Lewis and O'Brien were associated with and agents of that real estate firm. Because Lewis and O'Brien were dealing with Richards and R-J Devel-opment in the agency matter, i.e., the sale of the Trailwood Village property, on their own account and for their own benefit, Richards and R-J Development contend that Lewis and O'Brien violated fiduciary responsibilities owed to them as principals. The trial court, however, found no such violation and upon a review of the record herein, we affirm that ruling.

■ Real estate agents, and agents in general, are prohibited from dealing in the

agency matter on their own account and for their own benefit, *without the consent of their principal*, "freely given with full knowledge of every detail known to the agent[s] which might affect the transaction." 3 Am.Jur.2d *Agency* § 228, at 727–28 (1986). *See also*, SDCL 36–21–42.1(2), (4), and (13).

■ In the present case, there is absolutely no indication that Lewis and O'Brien dealt in the subject property without Richards' or R–J Development's consent, withheld information therefrom, or sought or attempted to deceive Richards and R–J Development. On the contrary, the record reveals that Richards is highly experienced in real estate transactions; that she was continually counseled by Attorney Gunderson; that Richards and Attorney Gunderson approached Lewis about the latter purchasing the Trailwood Village property; that the parites negotiated the sale and agreement on several occasions; that the parties dealt at arm's length; and that no deceitful or surreptitious activity transpired. Nothing in this case impugns the integrity of Lewis and O'Brien as real estate agents and there is no hint of a fiduciary violation.

### III.

WAS THE OFFER AND AGREEMENT TO PURCHASE SUFFICIENTLY UNFAIR AND UNREASONABLE SO AS TO BAR SPECIFIC PERFORMANCE UNDER SDCL 21–9–3? AND, IF NOT, WERE THE OPTIONS CONTAINED WITHIN THE AGREEMENT EXERCISED BY THE COMMENCEMENT OF THIS SUIT? WE HOLD THAT SPECIFIC PERFORMANCE IS NOT BARRED BY THIS STATUTE AND COMMENCEMENT OF THIS SUIT EXERCISED THE OPTIONS.

SDCL 21–9–3(1) and (2) provide that specific performance of a contract cannot be enforced against a party thereto, if he has not received an adequate consideration therefor, or, if it is not, as to him, just and reasonable.

The trial court determined the Offer and Agreement to Purchase was not unreasonable, unfair, or unconscionable and supported by adequate consideration. Richards and R–J Development contend specific performance is barred by SDCL 21–9–3(1) and (2) because the Offer and Agreement to Purchase is not supported by adequate consideration and is unjust and unreasonable as to them. The inadequate consideration contention is based on the fact that the Agreement does not contain a recital of consideration for the options to the balance of the Trailwood Village real estate and no money was actually paid for these options. Appellants base the unjust and unreasonable contention on the assertion that these options permit Lewis and O'Brien to tie up property for several years without any assurance that Lewis and O'Brien will ever exercise or invoke those options. It is asserted that such freedom to walk away from the options provided is both unjust and unreasonable; that such freedom fails to provide mutuality of remedy and thereby prohibits specific enforcement; and, in the alternative, it is asserted that commencement of this suit exercised the options in question.

■ Addressing the inadequate consideration contention first, we find it to be without merit. The sale of the initial 22 lots and the options for further real estate purchases were all part of an integral transaction whereby Richards and R–J Development would sell their Trailwood Village property and Lewis and O'Brien would purchase and develop portions thereof in phases. In the initial phase, Lewis and O'Brien were to repair the sewer. These repairs would rebirth FHA and VA financing and permit housing construction to begin. This benefit applied or would apply to the lands under the option provisions also, and any benefit conferred or agreed to be conferred constitutes good consideration. SDCL 53–6–1. Additionally, the option provisions are part of a single written instrument which is presumptive evidence of consideration. SDCL 53–6–3. Richards and R–J Development advocate there is a total want of consideration as regards the options, but

they fail to carry their burden of proof. SDCL 53-6-4. Consideration for the options exist, and it is adequate consideration.

■ As for the unjust and unreasonable contention, we find this to be without merit. In substance, Richards and R-J Development are arguing that the very nature of options is both unjust and unreasonable. Options were a part of the contract bargain. We refuse to uphold such a contention.

■ However, in order to award specific performance, there must be mutuality of remedy. SDCL 21-9-4. If one party to an instrument cannot seek compulsion of performance, the other party thereto cannot seek compelled performance. Thus, specific performance will not generally be awarded for "a contract which imposes a continuing obligation upon the person against whom the relief is sought while performance of its terms is optional with the party seeking relief...." 71 Am. Jur.2d Specific Performance § 27, at 44 (1973). An option, to the extent it remains unexecuted, is a unilateral instrument which lacks the mutual elements of a contract, 17 Am.Jur.2d Contracts § 32 (1964); 71 Am.Jur.2d Specific Performance § 142 (1973); and until an option is accepted, specific performance cannot be awarded. See Miller v. Hiett, 133 Colo. 576, 298 P.2d 394 (1956); Sooey v. Zacharski, 321 Mich. 351, 32 N.W.2d 479 (1948); Standard Reliance Ins. Co. v. Schoenthal, 171 Neb. 490, 106 N.W.2d 704 (1960); Bobo v. Bigbee, 548 P.2d 224 (Okla.1976); and Lincoln Land & Dev. Co. v. Thompson, 26 Utah 2d 324, 489 P.2d 426 (1971). However, the filing of

suit for specific performance before the expiration of the time limit for the exercise of the option is generally regarded as an exercise of the option and as supplying the element of mutuality; by such act the party who has not so far been bound thereby places himself under all the obligations of the contract. As plaintiff, the optionee submits himself to the jurisdiction of the court to compel him as well as the defendant to perform the contract thus consummated. The plaintiff does not then remain free to refuse performance.

71 Am.Jur.2d Specific Performance § 144, at 187 (1973) (emphasis supplied). See also, Asbury v. Cochran, 243 Ala. 281, 9 So.2d 887 (1942); Standard Reliance Ins. Co. v. Schoenthal, 106 N.W.2d 704; Mutual Life Ins. Co. v. Stephens, 214 N.Y. 488, 108 N.E. 856 (1915); Johnson v. Elliot, 123 Mont. 597, 218 P.2d 703 (1950); and Leadbetter v. Price, 103 Or. 222, 202 P. 104 (1921). Cf. Endres v. Warriner, 307 N.W.2d 146, 148 (S.D.1981), wherein this Court stated that by the real estate purchaser's tender of the price and institution of suit for specific performance, he submitted himself to the jurisdiction of the trial court thereby establishing mutuality of remedy.

■ Therefore, by filing suit, Lewis and O'Brien have exercised the option provisions and all parties must comply with their duties thereunder. This provides the required mutuality of remedy and removes the freedom not to invoke the options. To the extent the trial court's judgment and decree is inconsistent, it is reversed.

## IV.

DID THE TRIAL COURT ERR BY ASSESSING $21,182.36 OF THE SEWER REPAIR COSTS TO THE PURCHASE PRICE? WE HOLD THAT IT DID.

The purchase price of the first 22 lots was $110,000. Under the terms of the Offer and Agreement to Purchase, a $45,-000 down payment was to be escrowed and used for sewer repairs. Lewis and O'Brien were to negotiate and procure these repairs, and also agreed to pay the increase in the cost of these repairs over and above the down payment, with such additional repair costs to be deducted from the price of the lots. A bid/estimate for sewer repairs just under $40,000 was known to exist by all parties. Actual cost of repairs, however, unilaterally incurred by Richards and R-J Development after suit was instituted, was $71,182.36. Lewis and O'Brien

do not question the reasonableness of these repair costs.

In its findings of fact, the trial court found that the parties were significantly mistaken in their assumption of what the repair costs would be; that the costs in excess of $50,000 was an oversight and beyond the parties' expectations; and that the parties' Offer and Agreement to Purchase should be revised, reformed, and modified to require Lewis and O'Brien to pay the $21,182.36 sewer costs in excess of the $50,000 which could have been reasonably expected. In accordance with this finding, the trial court added this $21,-182.36 to the originally agreed upon purchase price of $110,000 for the first 22 lots.

■ On appeal, Richards and R–J Development assert the above facts are additional evidence that the parties never intended the Offer and Agreement to Purchase to be a complete and final agreement. Previously, we addressed the issue concerning the parties' Offer and Agreement to Purchase as creating a firm and complete agreement. Therefore, unlike track and field, appellants do not have several jumps over the barrier in appellate review. Further, we do not agree with the assertion that the alleged mistake regarding the costs of the repairs is sufficient to vitiate the Offer and Agreement to Purchase.

Lewis and O'Brien have likewise filed a Notice of Review on this issue. Although their rationale for reversal is not that persuasive, we do agree that the trial court erred in this regard. We explain.

■ SDCL 21–11–1 permits the revision of contracts when through mutual mistake of the parties, the contract does not express the parties' intentions. Revision, however, must be premised on the application of a party aggrieved. SDCL 21–11–1. Trial courts are not empowered to sua sponte revise contracts, when not petitioned to do so by any of the parties. In the present case, none of the parties to the Offer and Agreement to Purchase petitioned, moved, or requested the trial court

to revise the agreement. Thus, the trial court was without authority to do so. The parties' agreement is clear; Lewis and O'Brien are to negotiate, procure, and pay for sewer repair costs and these costs are to constitute the down payment and be deducted from the purchase price. The trial court exceeded its authority when it assessed $21,182.36 to the purchase price, and its decision in this regard is reversed.

### V.

IT IS URGED THAT THE TRIAL COURT ERRONEOUSLY FAILED TO AWARD DAMAGES AND ATTORNEY FEES TO LEWIS AND O'BRIEN. WE UPHOLD THE TRIAL COURT ON THIS ISSUE.

■ While Lewis and O'Brien concede that it would be improper to award them lost profits and specific performance, i.e., the lots, they nevertheless contend they should have been awarded the loss of use of the profits they could have made during the 1984 selling season. While this Court has previously recognized lost profits as a recoverable item, *Olson v. Aldren,* 84 S.D. 292, 299, 170 N.W.2d 891, 895 (1969), we therein stated that such damages cannot be speculative, contingent, or uncertain, and it is the fact of damages that cannot be uncertain. R. Dunn, *Recovery of Damages for Lost Profits 2d* (2nd ed. 1981). Here, no lots had been sold in Trailwood Village since 1981, and evidence pertaining to lost profits was based upon projected potential sales which did not rise above speculation and uncertainty. Having failed to establish the accrual of lost profits with reasonable certainty, the use of the alleged lost profits was properly denied.

■ As for the denial of attorney fees, Lewis and O'Brien fair no better. Attorney fees are recoverable as costs only if it is specifically provided for by statute. SDCL 15–17–7. *See also, Int'l Multifoods Corp. v. Mardian,* 379 N.W.2d 840, 844 (S.D.1985); and *Lowe v. Steele Constr. Co.,* 368 N.W.2d 610, 614 (S.D.1985). No South Dakota statute specifically allows recovery of attorney fees in specific performance

actions. We therefore determine that the trial court did not err in denying recovery of the same.

## CONCLUSION

For the reasons expressed above, we affirm in part, reverse in part and remand to the trial court for the entry of a judgment and decree consistent with our holdings herein. This new judgment and decree, inter alia, shall declare the options to have been exercised and order the parties to proceed appropriately; delete the assessment of $21,182.36 to Lewis and O'Brien and refigure the payments according to the original agreed price, same to include a deduction for the actual costs of sewer repair; and in all other respects, parallel the Judgment and Decree of Specific Performance appealed from.

WUEST, J., and HERTZ, Circuit Judge, Acting as Supreme Court Justice, concur.

FOSHEIM, C.J., and MORGAN, J., concur in part and dissent in part.

SABERS, J., not having been a member of the Court at the time this action was submitted to the Court, did not participate.

MORGAN, Justice (concurring in part, dissenting in part).

I concur in all issues decided by the majority opinion except Issue III dealing with the options contained in the contract.

The preliminary agreement between the parties called for a subsequent contract for sale. Mrs. Richard backed out on signing the second document. The action was to secure for the plaintiffs the benefit of their bargain to, in effect, require the contract for sale. This the trial court did by entering a judgment that set out the contract for sale. That judgment is before us to review.

In addition to the basic area already under development, the preliminary agreement, the unsigned contract for sale and the trial court's judgment all provided for a series of options to give the purchaser the opportunity to buy some or all of the land adjacent to the initial development. Besides being tied to the development in the agreement, these additional tracts were integrated into the scheme of the entire development. A part of the investment in the basic tract would inure to the benefit of the adjoining tracts.

In their complaint, plaintiffs did not ask the trial court to enforce their options by way of specific performance. They instead asked the court to "grant" their options under the agreement. While ineptly worded, I take this to mean that they were requesting the trial court specifically enforce the basic agreement so that they would be granted the opportunity to exercise their options in the future. It should be noted that the majority opinion obligates plaintiffs to immediately take the lots and acreage delineated under these options, which increases plaintiffs' liability under the contracts for deed by approximately $750,000.

The majority opinion relies upon 71 Am. Jur.2d *Specific Performance* § 144 for the proposition that a party who institutes suit in specific performance of an option is deemed to have exercised the option, thus providing the required mutuality of remedy necessary to enforce the option. As I read §§ 142–146, inclusive, the authors are discussing the exercise of options and the enforcement of the contract resulting therefrom. None of the cases cited by the majority deal with a situation wherein the options were contained as part of a larger contract. Normally, when instituting specific performance of an option agreement, a party wants to exercise the option. It is not clear here that plaintiffs wanted to become obligated and exercise their options; rather, they were seeking specific performance of the agreement to enter into a contract for deed.

Here, the trial court ordered specific performance of the contract. That included reinstituting the options, so that plaintiffs could elect to exercise them in the future. I believe this was correct.

[I]f specific performance is ordered, the decree should nearly as possible require

performance in accordance with the terms of the contract.... It does not follow, however, that a court of equity is required to enforce the contract completely, or not at all. Where it is possible to bring about substantial justice by adjusting the equities between the parties, a court of equity can grant relief.

*Ellison v. Ventura Port Dist.*, 80 Cal. App.3d 574, 583, 145 Cal.Rptr. 665, 670 (1978). I believe the question of the enforcement of the options is best left to another day. With all other aspects of the majority opinion I concur.

I am authorized to state that Chief Justice FOSHEIM joins in this concurrence in part and dissent in part.