**TUTTLE et al. v. BOOTES HATCHERIES & PACKING CO., Inc.**

Civ. No. 673.

United States District Court
D. Minnesota, Second Division.

Jan. 31, 1953.

J. B. Forbes (of Hall & Forbes), Marshall, Minn., for plaintiffs.

Arnold Brecht (of Brecht & Hedeen), Worthington, Minn., for defendant.

NORDBYE, Chief Judge.

Plaintiffs as copartners are engaged in general farming and turkey raising in the vicinity of Carter, South Dakota. Defendant is a Minnesota corporation and during the period involved herein was engaged in hatching and selling poults to turkey and chicken raisers in Minnesota, South Dakota, and other states. Early in 1950, the Tuttles ordered 6,500 turkey poults from the defendant at a price of 68 cents a piece to be delivered free of charge between April 15 and May 1, 1950. On April 17, 1950, the poults were delivered. There was a shipping loss of 43 poults, but that loss was amply covered by the extra poults added by the defendant to the shipment for the purpose of covering shipment losses.

At the time of delivery, the poults "looked droopy" and there were bloody droppings from the birds. Some were coughing and gasping, and within 24 hours there were 127 dead birds. The day after delivery, Jesse Tuttle telephoned the defendant that the birds were in poor condition. No further complaints were made to defendant by plaintiffs until July, 1950. Later, head swelling appeared in the birds and the coughing and sneezing persisted. The death rate of the birds continued although the plaintiffs used various medication in the brooder houses tending to alleviate the apparent colds from which the birds were suffering.

Notwithstanding the poor condition of the poults, the Tuttles sent to the defendant on May 5, 1950, a check in full payment of the 6,500 birds. The money, however, was furnished by the Pillsbury Company which was financing the purchase and feed program of the turkeys. The check was dated April 25, 1950, payable jointly

to the plaintiffs and the Bootes Hatchery, and was sent to the plaintiffs by the Pillsbury Company.

During the latter part of April and the first part of May, the condition of the turkeys continued to be poor. The death rate persisted, and after three weeks some 684 poults were dead. Plaintiffs sought the services of a local veterinarian and also arranged for a laboratory examination of certain of the poults. On one of the first examinations in the latter part of April, 1950, one Dr. Lenker found spots on the gizzards and intestines of the poults, and he concluded from this that the poults either had a present or previous condition of pullorum or bacillary diarrhea. Dr. Lenker concluded from the symptoms that there was suspected Newcastle disease in the flock and he advised the Tuttles to send some of the poultry to the State College at Brookings, South Dakota, for a laboratory examination. Some of plaintiffs' attempts in this regard were unsuccessful, but on July 17, 1950, three poults were taken to one Dr. Taylor, an assistant veterinarian at the South Dakota State College, and after his examination and diagnosis of the ailment of the poults as that of Newcastle disease, plaintiffs had the entire flock vaccinated with a "killed" virus Newcastle vaccine. On August 21, 1950, a Dr. Harshfield, head of the Veterinarian Department of the South Dakota State College, examined certain of the poults, and from that examination he found the test of Newcastle to be positive, but stated, "But this would be expected as they had gone through an earlier outbreak and also were vaccinated." However, he found that the three poults sent to him were suffering from sinusitis and he recommended that they be injected with streptomyacin. Thereafter, the majority of the flock was treated as Dr. Harshfield suggested.

It is fair to assume from the evidence that in July and August the death rate of the turkeys subsided considerably. The report of the Pillsbury agent, who made written reports contemporaneously with his inspections of the flock, indicates that on June 9th some 1,200 poults had died. On July 12th, he reported that the poults had been lost, without giving the number, by reason of sinusitis and pullorum, wind and rain, and that the turkeys were in a very bad condition. He further stated, referring to the plaintiffs, "I gave them a lot of things to do; only hope they do some of it. The turkeys will come O.K. with a fair chance." Apparently it was about this time that plaintiffs lost some 50 turkeys in a storm. It is significant to note that on July 24th the Pillsbury agent reported that about 1,500 birds had died. But, however, he reported on that date, "The turkeys look the best they ever have looked. Some very good." On August 8th he stated that the general condition of the turkeys was fair, and as to the question whether they were making suitable progress, he stated in his report, "Now I would say." No other report from any other Pillsbury inspection indicates the number of turkeys which were lost, though in the report of September 26, 1950, the inspector stated that the general condition of the turkeys was good. On November 16, 1950, plaintiff marketed 4,011 turkeys, and on January 13, 1951, they marketed the 65 remaining turkeys of the flock. There was a loss, therefore, not including the normal loss of 10 per cent, of some 1,774 turkeys, and plaintiffs attribute that loss to the defendant by reason of the fact that the birds were diseased at the time that they were delivered. They also contend that the remaining turkeys by reason of the various ailments with which they had been afflicted were not up to standard in weight or quality and that plaintiffs therefore had to take a loss on the turkeys by reason of the fact. They seek damage in the total sum of approximately $25,000.

Plaintiffs primarily predicate the liability of defendant upon a breach of implied warranty, that is, when the birds were sold the Tuttles relied upon defendant's skill and judgment as a turkey hatchery in selecting healthy poults suitable for the purposes for which the Tuttles bought them, but instead it is contended that the poults were diseased at the time of the delivery and that therefore there was a breach of the implied warranty.

After a careful consideration of the entire evidence, I am of the opinion that it

fairly sustains a finding that these poults, or at least a substantial number of them, were infected with pullorum and Newcastle disease at the time they were delivered to the Tuttles. All of the circumstances strongly tend to establish that fact. In April, 1950, when these poults were in defendant's hatchery awaiting shipment to plaintiffs, there was an outbreak of Newcastle disease in one of defendant's chicken hatcheries at Worthington, Minnesota. Although the evidence indicates that the chicken hatchery was separate from the hatch of the turkey poults, it appears in the evidence that Newcastle is a highly contagious disease and could have been carried from the chicken hatchery, a relatively short distance away, to the turkey hatchery. The evidence indicates that man may carry the disease from brood to brood on his clothes or on his shoes. Moreover, chickens from the Bootes Hatchery early in May, 1950, positively had Newcastle disease, and there is evidence that turkey poults sold by the defendants late in April, 1950, to turkey raisers in Minnesota showed evidence of Newcastle, either suspected or confirmed. Dr. Pomeroy of the University of Minnesota, an unusually well-qualified witness at this trial, testified that, from a description of the symptoms manifested by the birds sold to the Tuttles, it was his opinion that the birds were afflicted with Newcastle disease at the time they were delivered to the Tuttles. Moreover, it is not without significance that the chicken hatchery of the defendant was quarantined from May 4 to May 8, 1950, because of the sale of chickens on May 3rd which were infected with Newcastle disease.

I have no particular difficulty, therefore, in finding that these turkey poults had Newcastle disease as well as pullorum when delivered to the Tuttles and that a substantial number of the poults were lost by reason of their diseased condition when delivered. Dr. Pomeroy stated that Newcastle disease runs its course within three or four weeks and that the average death loss is from 15 to 20 per cent, although there are different types of the disease, some more virulent than others. The difficulty, however, in determining the damages which should be allowed in this matter is due to the fact that, in addition to pullorum and Newcastle disease, the turkeys also were afflicted with sinusitis, especially in the middle of the summer of 1950, and that the condition was such that the veterinarians recommended that streptomyacin be injected into the poults thus afflicted. Sinusitis is a disease which has no relationship to Newcastle or pullorum. Dr. Pomeroy did say that the poults "could have been infected with sinusitis when delivered", but obviously his statement thus expressed is a mere supposition and does not rise to the dignity of an opinion. Moreover, all of the evidence would not justify a finding that these poults had sinusitis when delivered. Dr. Pomeroy did state that Newcastle disease will not cause sinusitis, and while he did express the opinion that a bird having gone through an onslaught of Newcastle might be more susceptible to sinusitis, he modified that statement later on by stating that a flock of turkey poults having gone through Newcastle would not be any more subject to sinusitis than if they had not had Newcastle disease. In addition, the evidence indicates that sinusitis is a common disease among turkeys; it spreads slowly through the flock and the death loss is relatively low. Consequently, at best we have a realm of speculation and guesswork if we assume that there was any causal connection between the Newcastle or pullorum and the subsequent advent of sinusitis with which these poults were afflicted. True, one may reason that the birds were weakened by the Newcastle disease and hence were more susceptible to the scourge of sinusitis. That is entirely possible, but, on the other hand, it is also just as possible that a common disease such as sinusitis afflicted the birds which had had Newcastle as well as the birds which had not been afflicted with that disease. The persuasive fact is that there is not any satisfactory evidence that these birds had sinusitis when delivered. See Frame v. Hohrman, 229 Minn. 468, 39 N.W.2d 881. The most that can be found from the evidence is that they had pullorum and Newcastle disease, but where the sinusitis virus or germ came from is entirely a matter of speculation.

The question then arises as to the damages which plaintiffs have proved which directly and naturally resulted from the breach of warranty. That there was a substantial loss of poults from Newcastle is reasonably clear. Some 682 turkeys were dead in three weeks. That death toll is striking evidence of some virulent disease, and in view of the positive findings of Newcastle it seems entirely reasonable to assume that the tremendous loss which occurred during the first two months was caused by this disease. Apparently the Tuttles kept no particular record of the number of poults lost outside of the number that succumbed during the first three weeks. However, the Pillsbury inspector did make written reports and there is every reason to believe that these reports were reasonably accurate in reflecting the condition of the flock and the number of poults that had died at the time of the report. The majority of the death loss occurred during the first two months. This is entirely consistent with Dr. Pomeroy's testimony to the effect that the Newcastle disease would run its course in a period from three to four weeks and that the death loss ranges from 15 to 20 per cent. As stated, Mr. Jennings, the Pillsbury inspector, indicates in his report that on June 9th 1,300 poults were lost. In his report of July 24th, he indicates that 1,500 poults were lost. Undoubtedly this is an estimate, but the probabilities are that it is reasonably accurate. My view is that it is reasonable to assume that the large majority of the number of poults that succumbed during the first four weeks died on account of the onslaught of Newcastle disease which ran through this flock. As indicated heretofore, 43 poults were lost in transit, but this loss was amply covered by the poults which the defendant shipped in excess of the 6,500. The evidence also indicates that some 50 birds were lost in a storm. The normal loss of turkeys during a six or seven months' season, which is generally the prescribed time for poults to mature so that they are ready for the market, is about 10 per cent. While it is probable that the normal loss is heavier during the early months, it must be recognized that the Tuttles had to contemplate that there would be a loss of about 650 birds during the entire season. This would indicate that there would be an average loss of 100 birds a month. Therefore, during the first two months in a normal flock, one would expect a loss of at least 200 birds. If it is assumed that there was a loss of some 1,300 birds during the first two months, and subtracting the normal loss of 200 birds and the 50 birds lost by the storm, we have a loss of some 1,050 birds which can be reasonably attributed to the Newcastle and pullorum diseases. This figure seems entirely consonant with the weight of the evidence, and while it must be recognized that it is an approximation, it is the most accurate approximation that I am able to deduce from a fair consideration of all the evidence. That figure also gives due consideration to any overage of birds which arrived alive on shipment. However, I do not find that there is any satisfactory evidence which would justify a finding that the birds which survived the Newcastle disease or the pullorum became inferior birds and that damage can be predicated upon that assumption. We have no way of knowing what number of the birds which remained had had Newcastle or sinusitis, and any loss in weight or quality in the remaining birds cannot, therefore, be considered in computing damages. Any loss in weight or inferiority in quality may be due to the sinusitis rather than the Newcastle disease, and to attempt to determine any causal connection between the Newcastle and the loss in weight and quality would be sheer guesswork.

These birds were sold by the defendant to plaintiffs to be raised for the market. That object, of course, is the primary purpose of a turkey raiser when he buys poults from a hatchery. This purpose was known to the seller and constitutes a special circumstance which must be considered in determining the applicable rule of damages. In Minnesota, as well as in South Dakota where the Uniform Sales Act has been adopted, the measure of damages for breach of contract follows the rule in Hadley v. Baxendale, 9 Exch. 341. It lays down the time-honored rule that damages are recoverable which arise naturally from the usual course of things, that is, such damages as might reasonably have been

contemplated by the parties when making the contract that would result from the breach. See Otis Elevator Co. v. Standard Construction Co., D.C.Minn., 92 F.Supp. 603; Despatch Oven Co. v. Rauenhorst, 229 Minn. 436, 40 N.W.2d 73. Loss of profits is recoverable in Minnesota for breach of contract if the loss is a direct consequence of the breach, and where profits were reasonably certain to accrue and the amount is not too speculative. Heflebower v. Sand, D.C.Minn., 71 F.Supp. 607; 5 Dun.Dig., 3d Ed., Sec. 2534. The Uniform Sales Act does not change the law in Hadley v. Baxendale, and the cases arising before the adoption of that Act have not been superseded as the measure of damages for breach of warranty. The rule stated in Moorhead v. Minneapolis Seed Co., 139 Minn. 11, 165 N.W. 484, L.R.A.1918C, 391, Barthelemy v. Foley Elevator Co., 141 Minn. 423, 170 N.W. 513, and Johnson v. Foley Milling & Elevator Co., 147 Minn. 34, 179 N.W. 488, 16 A.L.R. 856, may therefore be resorted to. That rule which applies to a growing crop is reasonably analogous here, and as stated in Johnson v. Foley Milling & Elevator Co., supra, 147 Minn. at page 38, 179 N.W. at page 489:

"The measure of damages was the difference between the value of the crop raised from the seed furnished and that of a crop such as would ordinarily have been raised from the seed had it been of the variety contracted for."

This rule was approved in McLane v. F. H. Peavey & Co., 72 N.D. 468, 8 N.W.2d 308. The other seed cases in accord may be found in 1A Uniform Laws Ann., Sec. 69, note 359, and 3 Williston on Sales, Rev.Ed., Sec. 614. In Patton v. Ballam, 115 Vt. 308, 58 A.2d 817, where there was a breach of warranty causing the loss of animals, the trial court was affirmed in giving the instruction noted in the following,

"The court charged the jury that the measure of damages was the loss directly and naturally resulting in the ordinary course of events from the breach of warranty, and called attention to the evidence as to what the mink would have been worth in the fall had they lived and matured as expected, subject to the percentage of normal loss to be expected, to the cost of feeding to maturity and the cost of pelting, and to the evidence of the value of the kits at birth and at the separation period. This was excepted to on the ground that the only measure of damages as to the kits that died was their then market value."

The mink case and the seed cases are fairly analogous to the situation here; at least, they do indicate the appropriate rule in fixing damages. And in this connection reference may be made to the statement in 5 Dun.Dig., 3d Ed., Sec. 2534, where the following appears,

"* * * The law does not permit a recovery of damages for breach of contract which are merely speculative but it does not require proof to an absolute certainty. When a breach is committed it is inclined to accept the challenge of the wrongdoer that damages cannot be ascertained; and within reasonable limits it will make an effort to ascertain them * * *."

The evidence indicates that in a normal flock the ratio of tom turkeys and hen turkeys is 44.6 and 55.4 per cent respectively. Taking these percentages of the 1,050 birds which succumbed to Newcastle and pullorum, we obtain 468 toms and 582 hens. Toms average 26 pounds at the end of the season and hens 16 pounds. If these 1,050 birds had been raised to maturity, it is reasonable to find that the toms would have weighed 12,168 pounds and the hens 9,312 pounds, or a total of 21,480 pounds. The average price of turkeys, according to the evidence, in November, 1950, was 31.5 cents per pound. Multiplying 21,480 by this price per pound, we obtain a sales price of $6,766.20 for the 1,050 turkeys. The evidence indicates that it requires .4 pounds of feed to produce one pound of turkey, and on the basis of 21,480 pounds of turkey, it would follow that it would require 85,920 pounds of feed. Feed, according to the evidence, averages about 3.35 cents per pound, and multiplying 85,920 by 3.35, we obtain a figure of $2,878.32, which would represent the cost of the feed, and the difference between the selling price of $6,766.20 and $2,878.32, the cost of raising the turkeys, is $3,887.88. In

addition, there would be the labor cost to which the Tuttles would be subjected in taking care of these 1,050 turkeys in the event they had lived, but clearly that item is offset by the extra labor that the Tuttles had in looking after a sick flock of turkeys. Moreover, the feed actually used for the turkeys which died is probably nominal; at least, the evidence is not sufficiently definite to enable any computation of that item. There is, however, the sum of $400 which the Tuttles spent for medicine, medical care, and expenses incurred which are reasonably allocable to the breach of warranty, and that sum should be added so as to properly reflect the damages which are recoverable herein. I conclude, therefore, that the plaintiffs should have judgment against the defendant in the sum of $4,287.88 by reason of breach of warranty in the sale of these 6,500 poults.

Defendant has raised the question of the real party in interest as to some 1,300 poults. But, whatever beneficial interest Philip Salem may have had in them, plaintiffs had the legal title, and clearly, in view of Salem's testimony in support of the Tuttles' claim herein, there can be no question as to the right of the Tuttles to sue for the entire claim against this defendant.

The above may be considered as the Court's findings of fact, and as conclusions of law it finds that plaintiffs are entitled to judgment against defendant in the sum of $4,287.88, together with their costs and disbursements herein.

An exception is allowed.