## E. T. ALFORD v. SIMON KRUSE.[1]

April 2, 1931.

No. 28,066.

[1]Reported in 235 N. W. 903.

*J. E. Hendrickson* and *Christian G. Dosland,* for appellant.

*C. E. Warner* and *Mark F. Crotty,* for respondent.

DIBELL, J.

Action to recover damages for a breach of warranty in the sale of three registered Guernsey cows. The court directed a verdict for the defendant at the close of the plaintiff's testimony. The defendant rested without offering evidence. The plaintiff appeals from an order denying his motion for a new trial.

■ The plaintiff owned a herd of graded Guernseys and operated a dairy farm a mile and a half southwest of Fargo, North Dakota. He was in search of registered Guernseys for breeding purposes to build up a pure-bred herd. The defendant was a breeder of registered Guernseys and owned and operated a dairy farm known as the Radisson farm, 12 miles north of Minneapolis. On November 25, 1927, the plaintiff purchased of the defendant three thoroughbred Guernsey cows for a total price of $825, one for $400, one for $225, and one for $200. They were supposed to be with calf. One of them was not. That plaintiff's purpose was to build up a pure-bred herd by getting thoroughbreds, and that it was communicated to the defendant is not open to question. The plaintiff and the defendant and Iverson, defendant's herdsman, talked it over. The defendant said:

"As I recall the conversation it was that he stated he had been farming with grades, and he would like to get into a line of pure-bred Guernseys. And I said to him we would be glad to show him what the farm had to offer, and that we would be glade to quote him very low rates as we wanted to get into the Dakota market. That is in brief the general conversation that was had on that subject."

The defendant took the plaintiff from Minneapolis to the farm. The conversations and negotiations were largely with the herdsman. The plaintiff testifying said:

"Well, I told Iverson that I had all grades, and repeated to him as I had to Mr. Kruse that I wanted some stock fit for building a pure-bred herd from, for the purpose of breeding up a pure-bred herd, and that I couldn't afford to put a lot of money into show stock, that I was more particular about production than the show type. That I would like, if possible, to get cows that were young so they would have a long life ahead of them for production, that is, for producing calves."

The defendant testified that it was correct to say that he and Iverson jointly participated in making sales to the public, that is, in "making purchases and sales." Nearly all of the negotiations were between the plaintiff and Iverson, whose authority is not questioned. He was the one who showed the stock to prospective purchasers, and he understood his business and was competent. The defendant was in personal touch with his herd, but his time was occupied with his business in Minneapolis. He had been interested in breeding and dairying for many years and understood the business.

We pass a consideration of express warranty. There was an implied warranty of suitability and fitness for the purposes for which the cows were bought and sold. The case is within the principle of Bekkevold v. Potts, 173 Minn. 87, 216 N. W. 790, 59 A. L. R. 1164, though that involved the sale of a tractor, and other similar cases. 5 Dunnell, Minn. Dig. (2 ed. & Supp.) § 8576. It is not ruled by Frederickson v. Hackney, 159 Minn. 234, 198 N. W. 806, which was an action for the breach of an implied warranty of procreative ability of a bull bought a few days after its birth.

In 1 Williston, Sales (2 ed.) § 235, p. 461, it is said:

"In several cases where animals have been sold for breeding purposes, the seller, not having knowledge of the defect and not being a breeder or dealer in animals of the sort, has been held subject to no implied warranty of the animals' capacity. If the seller is such a breeder a warranty is implied at common law unless the buyer relies on his own judgment."

There is cited in support of the first statement Thompson v. Miser, 82 Ohio St. 289, 92 N. E. 420, 19 Ann. Cas. 871, and McQuaid v. Ross, 85 Wis. 492, 55 N. W. 705, 22 L. R. A. 187, 39 A. S. R. 864. These are cited in the Fredcrickson case, 159 Minn. 234, 198 N. W. 806.

The Bekkevold case, 173 Minn. 87, 216 N. W. 790, 59 A. L. R. 1164, is in harmony with the portion of § 15 of the uniform sales act, G. S. 1923 (2 Mason, 1927) § 8390(1) which reads as follows:

"Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose."

In 1 Williston, Sales (2 ed.) p. 478, § 240, it is said:

"The word 'manufacturer' is given a wide meaning in the law of implied warranty. All sellers who produce the article which they sell are classed in this category—thus a grower of plants or seeds or crops and one who breeds horses or cattle are included."

In support of the last statement there are cited among other cases Bateman v. Warfield, 12 Ga. App. 259, 77 S. E. 104; Edwards v. Dillon, 147 Ill. 14, 35 N. E. 135, 37 A. S. R. 199; Merchants & M. Sav. Bank v. Fraze, 9 Ind. App. 161, 36 N. E. 378, 53 A. S. R. 341; Redhead Bros. v. Wyoming Cattle Inv. Co. 126 Iowa, 410, 102 N. W. 144. That § 15 of the uniform sales act applies to the sale of animals for breeding purposes is held in Petersen v. Dreher, 196 Iowa, 178, 194 N. W. 53, and Trousdale v. Burkhardt, 207 Iowa, 1133, 224 N. W. 93, when subd. 5 is relied upon. The showing made justifies the application of the doctrine of implied warranty.

The question whether the defendant's herd and the three cows sold were infected with contagious abortion, or Bang's disease as some of the witnesses termed it, was one of fact. The disease is one much dreaded by dairymen. It is productive of great loss. It is difficult of treatment or cure. A breeder cannot be justified in selling a cow from an infected herd for the purpose of immediate breeding. Gesme v. Potter, 118 Or. 621, 247 P. 765. The defendant knew that he had an infected herd, and the jury could find that he knew the disease was contagious abortion.

The three cows were taken to the plaintiff's farm immediately upon purchase. They were kept in the barn throughout the winter. They did not have the run of a pasture. The plaintiff had a herd of about 20 cows. He had been dairying for seven years. There had been no contagious abortion in his herd. There had been few additions of cows from without and none recently. In April, 1928, one of the three cows aborted, and in May another. The third cow was not in calf when bought though supposed to be. She was bred after taken to the plaintiff's farm and aborted in her seventh month. Beginning a few weeks after the two cows aborted six of the plaintiff's grade cows aborted after having carried their calves seven to eight months. In 1929 the three cows were sold to the owner of a dairy near Glyndon, Minnesota, and it may be inferred that they were taken there because the herd was infected.

In July, 1928, 110 cows from the defendant's herd were subjected to the agglutination blood test and the results determined at the diagnosis laboratory of the university. The reaction of 39 was positive, of 61 negative, and 10 were termed suspects. The three sold were subjected to the same test on December 4, 1929, and the reaction of all was positive. The defendant knew of abortion trouble in his herd when he sold. He does not say that it was contagious abortion. He refrains from saying so. The jury could find that it was. It was more than the occasional abortion. It caused trouble and some concern.

The disease may be carried from herd to herd by a transfer of the cattle, or by poultry about the barn, or by dogs or other animals

passing from farm to farm, or by cows. There is evidence that there were herds about Fargo which were infected. The evidence which we have stated is enough to carry to the jury the question whether the three cows were infected when purchased and whether the disease was carried by them to the plaintiff's herd and to leave the question of the application of implied warranty to the jury.

■ The rule admitting evidence should be liberal. 22 C. J. pp. 643-644, § 738; 1 Wigmore, Evidence (2 ed.) § 568; Grayson v. Lynch, 163 U. S. 468, 16 S. Ct. 1064, 41 L. ed. 230. This is not to enable the jury to make a guess nor to carry the case to the jury as one of fact; but it is to enable the jury, with all useful and legitimate information at hand, to reach a correct result. Farmers and dairymen familiar with the subject, and if they have a sufficient familiarity through knowledge of the facts, may testify to the presence of the disease though they are not veterinarians. We so held in Wilson v. Lynard, 162 Minn. 135, 202 N. W. 713.

There was evidence which must be taken as proving it to be a fact that there was abortion trouble in the defendant's herd when he sold the three cows. If there was they were not fit for the purposes for which they were bought. Evidence in proof of the claim of the plaintiff that the three cows if infected were not fit for the use for which they were bought was excluded. It must be held that cows so infected are not fit to be put into a clean herd. Upon no other theory could such evidence be rejected, and it was better that it be received. It could not be excluded as irrelevant. Of necessity proof is difficult to adduce. There should be liberality in receiving evidence, but it must stop short of permitting a guess or letting a case go to the jury without adequate proof.

Order reversed.

HILTON, J. (dissenting).

The vital point in this case is: Was there evidence sufficiently proving that any of the three cows had contagious abortion at the time of the sale. It was incumbent upon plaintiff to prove that *then* one or more of the cows had the disease. The trial court, being of the opinion that plaintiff had failed to produce such evi-

dence, directed a verdict for defendant at the close of plaintiff's case. It is true that both by the trial court and here the evidence must be viewed in the light most favorable to plaintiff. So viewed, with the reasonable inferences to be drawn therefrom, I think the trial court properly directed a verdict.

The majority opinion refers to a portion of the evidence; many other undisputed facts appear in the evidence so that the record as a whole presented a situation where a decision by the jury would be a mere matter of conjecture and guess work. A jury should not be permitted to enter the realm of speculation.

