# HOWARD FRAME v. OTTO HOHRMAN.[1]

December 2, 1949.

No. 34,971.

[1]Reported in 39 N. W. (2d) 881.

*Burton R. Sawyer,* for appellant.
*James O. Caulfield,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying defendant's motion for a new trial.

Plaintiff sued defendant to recover damages for a breach of warranty in connection with the sale of four cattle. In his complaint he alleged that on or about July 13, 1947, defendant sold and delivered to him four heifers for $640; that before and at the time of the sale defendant warranted and guaranteed the heifers free and clean of disease; that he purchased the heifers on this representation and warranty by defendant and in reliance upon it; that after the purchase it was discovered and established that the heifers had Bang's disease; that they had it before and at the time of the sale and were not free and clean of the disease as warranted and guaranteed by defendant; that it became necessary for plaintiff to sell the heifers on the market at a loss; and that plaintiff was also damaged by the reduction in the amount of milk obtained from the heifers.

Defendant in his answer admitted the sale, but denied other allegations in the complaint, and for a separate defense alleged that plaintiff requested him to sell the heifers; that he selected the animals himself from defendant's herd; that plaintiff did not rely upon any representation made by defendant; and that if the heifers became infected with Bang's disease they became so infected after leaving the premises of defendant on July 13, 1947.

Plaintiff testified that he first met defendant about July 1, 1947, when he went to defendant's farm, which we shall refer to as the Castle Rock farm, and inspected some cattle which he claimed defendant had advertised for sale; that he asked defendant if he had any Jersey cattle for sale and if they were clean; that the latter told him that he had a clean herd and had never had any trouble with them; that he later returned to the farm on July 13 and bought four

Jersey heifers about two years old from defendant's herd of about 70 cattle at $160 each, or a total of $640; that he attempted to select some with ear tags, but that defendant would not sell them, and that between him and defendant they decided on the four he purchased. Plaintiff said that the four heifers he bought had average calves some time between the purchase date and August 1, 1947; that for about three weeks after they "freshened" they produced about 12 gallons of milk a day; and that afterward the cow that later tested as a reactor gave hardly any milk, and the milk supply from the other three gradually declined to four gallons a day at the time he disposed of them.

It further appears from the record that on November 16, 1947, plaintiff had six of his cattle, including the four purchased from defendant, tested for Bang's disease by a veterinarian. Of the four heifers purchased from defendant, the test showed one to be a reactor and the other three to be suspects. Upon the advice of the veterinarian, the four heifers were sold to a meat packer. The reactor was sold about November 20, 1947, and the suspects about December 11, that same year. All were sold at less than the price paid defendant.

Defendant testified that at the time of the trial in June 1948 he was living on the Castle Rock farm; that he had owned the farm for about six years and had personally lived there for about three and one-half years, although his wife and some of his children who were attending school had lived there longer; that prior to the time he moved to the Castle Rock farm he lived on what we shall refer to as the Greenvale farm, about five or six miles south of the Castle Rock farm; and that he was living on the Greenvale farm, which he rented, in 1940, at the time Dr. A. O. Garlie, the veterinarian, tested his herd in June and July of that year. He claims that the herd which he owned while living on the Greenvale farm was entirely disposed of and that none of the cattle from the Greenvale herd were ever brought to the Castle Rock farm. It appears that between sometime in 1943 and 1946 defendant also rented another farm, which was operated by his son Ralph, referred to as the Van

Slyke farm, located a little south and across the road from the Castle Rock farm, and that he was interested in some cattle on this farm, but he testified that none of the cattle on either the Greenvale or the Van Slyke farms ever mingled in any way with the cattle on the Castle Rock farm. When asked if he ever had had any Bang's disease in his herd on the latter farm, he replied that he had not.

Defendant claimed that his first contact with plaintiff was in the fall of 1946, when plaintiff called at his farm one evening about nine o'clock, and that there was some discussion then about the sale of cattle, but that nothing was done. He could not recall the exact day plaintiff first came to his place in July 1947, but said that plaintiff and his father came to his farm again on July 13 and that he (plaintiff) was "ready to buy the Jerseys now." He said he informed plaintiff that on account of his physical condition he could not continue to farm and that he would rather sell his cattle at an auction than to sell to plaintiff, because if he had an auction he would have to have a Bang's test, and "I wouldn't have any draw-backs on me." He claimed that plaintiff then said that he would take them without testing; that the latter selected the four heifers involved; and that after some discussion about the price they agreed upon $160 per head. When asked whether he or plaintiff picked out the four heifers, he described how the four were selected from the herd and said in effect that they were selected more by plaintiff than by him. The cattle were delivered to plaintiff's home that day, and some time after that he met plaintiff on the street in Northfield and the latter told him that the heifers each had calves. He then said that some time around October plaintiff again came to his home, and he quoted plaintiff as saying, "I am coming back to buy some more of your heifers," and that plaintiff talked about getting 13 gallons of milk a day from the four cows he had previously purchased. He explained that he had some talk that day with plaintiff about having adopted a plan a long time before for the vaccination of calves and that he vaccinated calves from four to eight months old under this plan. He said that after they were vaccinated they were kept on the premises from a year to 18 months and that he had vaccinated

about 19 calves between the ages mentioned. On direct examination, he indicated that plaintiff talked to him about buying some of these vaccinated heifers, but on cross-examination said that plaintiff was not interested in the 19 calves. He admitted that plaintiff again called at his place after plaintiff had had the four heifers tested, and that plaintiff told him that he had had bad luck with the cattle he purchased, as the test showed that they had Bang's disease.

. On cross-examination, defendant admitted that his son Ralph had sold some cattle to one Sherman Brown, but not from the Castle Rock farm. He admitted that Brown claimed that he contracted undulant fever from the cattle, and when asked if the buyer got his money back defendant said: "He don't get his money back. He got his, some money back after his service in the army."

Defendant further testified that the herd of cattle on his farm on July 13, 1947, the date plaintiff purchased the four heifers, had been there for about four years, and that it had been started from all tested cows which he bought in the country and at auctions.

Ralph Hohrman, aged 31 years, testified that he had resided on the Van Slyke farm for about two and one-half years prior to the spring of 1946, at which time he gave up possession and moved to the home (Castle Rock) farm; that there was a herd of cattle on the Van Slyke farm which he took care of and that this herd was completely disposed of when possession of the Van Slyke farm was relinquished; that none of these cattle were ever taken over to the Castle Rock farm across the road and that none of the herds on these two farms ever mingled; that he was present on July 13 when plaintiff bought the cattle; that after some dickering about the price and some discussion about tests plaintiff bought the four without a test, provided they would be delivered that night, which was done; that plaintiff selected the heifers out of the herd himself; and that plaintiff came back to the farm again in October and said that the cows were "doing fine and giving around 13 gallons of milk a day, and they wanted more just like that." Ralph indicated at that time that plaintiff wanted to buy some of the vaccinated calves, but that they would not consider selling them. He said that

Sherman Brown got his cattle from the herd disposed of when he relinquished the Van Slyke farm in the spring of 1946.

Dr. Garlie, the veterinarian who conducted the tests on plaintiff's cattle on November 16, testified, over defendant's objection as to the results, that he had made two tests for Bang's disease on defendant's herd in 1940 and another test on four of defendant's cattle in December 1947; that the first test he made on defendant's herd, on June 3, 1940, showed 69 animals to be negative, 28 reactors, and 10 suspects; and that the next test, made on July 2, 1940, disclosed 56 negative animals, 12 reactors, and 8 suspects. The last test, made December 2, 1947, was on only four of defendant's cattle, and one suspect was found. The veterinarian described briefly the technical aspects of the tests and also said, when asked as to the toughness and longevity characteristics of the germ in a herd, "It is rather a resistant disease, difficult to control and difficult to eradicate." He said that he knew of no specific cure for it; that it was contagious; and that it would pass apparently by contact. He said that the disease germs apparently live for some time in the discharge from the cattle and in the soil, and that it was his opinion that the disease could live for quite some time in one herd and that in other herds it would disappear quite rapidly. He said that there was no set period of how long it would take a cow or heifer to contract the disease; that actual field observation had shown that a cow could contract it within two to four weeks, but that it would probably be nearer a month. He did not know of his own knowledge that the four heifers bought by plaintiff from defendant on July 13, 1947, had Bang's disease on that date, as he said that he was testifying only from what was shown at the time he tested the animals on November 16. He also admitted that the tests made on defendant's herd on June 3 and July 2, 1940, were at the Greenvale farm, which the record shows was about five miles from the Castle Rock farm, where he made the test on four of defendant's cattle in December 1947. He was unable to say whether the cattle he tested in 1940 were the ones he saw in December, as he explained that in 1940 he tested the com-

plete herd, while in 1947 he tested only four cattle, and that he could not remember individual cattle for that length of time.

We believe that the principal legal issues for our consideration are:

(1) Whether the evidence sustains the verdict.

(2) Whether evidence as to loss of milk was admissible.

It is apparent from an examination of the record that the evidence is inconclusive and insufficient to sustain the verdict of the jury, and that therefore a new trial must be granted as requested.

Here, we have a situation where plaintiff admits that he did not require a test of the heifers before he purchased them on July 13, 1947, but claims that he relied upon the statements of defendant that the herd was clean. Contrasted with this is the uncontradicted testimony of defendant and his son that the herd from which they sold the four heifers to plaintiff was not infected and that this particular herd on the Castle Rock farm was started by defendant about four years prior to the trial from tested stock. We also have their uncontradicted testimony that the herd on the Greenvale farm, tested on two occasions in 1940 and found diseased to some extent, had been disposed of, and again the uncontradicted testimony of defendant and his son that the herd on the Van Slyke farm from which Sherman Brown purchased animals had been disposed of by the spring of 1946, when possession of the Van Slyke farm was relinquished, and that none of these herds on the various farms ever mingled with each other. In addition to this, we have the testimony of the veterinarian called by plaintiff that he did not know whether the four heifers in question had Bang's disease at the time they were purchased by plaintiff, as he did not test them until the following November 16, and that field observations disclosed that a cow could contract the disease within two to four weeks, or more probably a month.

This court, in a previous case dealing with a claim of Bang's disease in cattle, said in Alford v. Kruse, 183 Minn. 158, 163, 235 N. W. 903, 905:

"* * * Of necessity proof is difficult to adduce. There should be liberality in receiving evidence, but it must stop short of permitting a guess or letting a case go to the jury without adequate proof."

Even though we view the evidence in the instant case in the light most favorable to plaintiff, which we are compelled to do, we can still find no adequate proof from the record that the four heifers he purchased from defendant on July 13, 1947, were diseased at that time. The burden of proving that they were diseased at the date of purchase was upon plaintiff. We recognized in Alford v. Kruse, 183 Minn. 162, 235 N. W. 904, that Bang's disease is highly contagious when this court said:

"The question whether the defendant's herd and the three cows sold were infected with contagious abortion, or Bang's disease as some of the witnesses termed it, was one of fact. The disease is one much dreaded by dairymen. It is productive of great loss. It is difficult of treatment or cure. A breeder cannot be justified in selling a cow from an infected herd for the purpose of immediate breeding. Gesme v. Potter, 118 Or. 621, 247 P. 765."

It is our opinion that unless plaintiff can furnish testimony showing that some or all of defendant's herd tested at the Greenvale farm in 1940 was incorporated into the latter's herd at the Castle Rock farm, where plaintiff purchased the four heifers, any testimony as to the tests made on the Greenvale farm herd in 1940 is inadmissible as too remote, in view of the testimony of defendant and his son that the Greenvale farm herd was disposed of and never mingled with the Castle Rock herd, some six miles away. As the record now stands, it appears to us that this testimony might be prejudicial to defendant without a more specific showing that the cattle purchased by plaintiff either originated from the Greenvale herd or mingled with or came in some contact with them. This reasoning would also apply to some extent in connection with the testimony as to cattle sold to Sherman Brown, unless there is some evidence to offset defendant's testimony that his herd on the Van Slyke farm had all been disposed of prior to the spring of 1946 and

had never mingled with or been mixed in any way with the herd on the Castle Rock farm. The situation in this case, however, is somewhat different, in that the Van Slyke and Castle Rock farms were adjacent to each other, on opposite sides of the road, and apparently the Van Slyke farm herd was not all disposed of until the spring of 1946. We realize, however, that the question of the admissibility of evidence under such circumstances must be left largely to the discretion of the trial court.

In Watre v. G. N. Ry. Co. 127 Minn. 118, 122, 149 N. W. 18, 20, this court said:

"* * * Evidence must afford a basis for relief over and above mere conjecture and be more than remotely relevant. No general test has been established for determining whether it is too slight, conjectural or remote. These questions must be left largely to the judgment of the trial court."

Again, in Greene v. Mathiowetz, 212 Minn. 171, 176, 3 N. W. (2d) 97, 99, we said:

"The modern tendency is to admit evidence freely and 'to give as wide a scope as possible to the investigation of facts.' 2 Dunnell, Dig. & Supp. § 3251. For this reason, 'courts should be slow to set up technical rules to exclude as evidence what would be accepted as relevant in the ordinary affairs of life.' Id. Supp. § 3251. Cf. Mahowald v. Beckrich, 212 Minn. 78, 82, 2 N. W. (2d) 569. Therefore, if the evidence offered 'conduces in any reasonable degree to establish the probability or improbability of the fact in controversy it should go to the jury.' Id. Dig. & Supp. § 3251, and cases under note 52."

In connection with the admissibility of testimony in Windorski v. Doyle, 219 Minn. 402, 18 N. W. (2d) 142, where the trial court refused to admit certain testimony as too remote, we said that the court erred because, while it was true that the occurrences were remote in time, that would go to the weight of the testimony and not to the admissibility.

In connection with the question whether plaintiff was entitled to show loss of milk from the cows purchased as a measure of his damages, it is our opinion that such testimony is admissible where a proper foundation is laid, so as to show what the actual damage or loss amounts to and where it is shown that the production of milk was within the contemplation of the parties at the time the purchase and sale was made.

In Miller v. Reiter, 155 Minn. 110, 112, 192 N. W. 740, 741, we said that "the amount of the damages must be established by fair proof and not left to conjecture."

In Olson v. Naymark, 177 Minn. 383, 384, 225 N. W. 275, this court said:

"* * * All agree that in any case conjectural or speculative damages cannot be recovered. The award by a jury is not discretionary. The evidence must give a basis for a reasonable determination of amount. Along the line from speculation to certainty there is a point not found by mathematical demonstration where it can be said that a jury or other fact-finding tribunal can give a safe judgment of the amount of damages * * *."

Lanesboro Produce & Hatchery Co. v. Forthun, 218 Minn. 377, 16 N. W. (2d) 326, was an action to recover on a note for the purchase of baby chicks, wherein defendant counterclaimed for damages for breach of warranty. The court and counsel treated the loss of egg production as special damages, and the case was tried on that theory. Plaintiff contended that the court in charging the jury in regard to special damages erred in not instructing it that such damages, to be recoverable, must have been within the contemplation of the parties as a result of the breach of warranty. The court charged that special damages were such as resulted (218 Minn. 380, 16 N. W. [2d] 328) "directly and naturally" when "properly pled and proved." No request was made by plaintiff for an instruction that the special damages must have been within the contemplation of the parties. At the trial, plaintiff objected to the evidence on the ground that the loss was remote. We said that de-

fendant's answer was broad enough to admit evidence of loss of egg production as special damages. It was there held (218 Minn. 381, 16 N. W. [2d] 328):

"* * * The evidence of loss in that respect was quite definite and, under the circumstances disclosed by the evidence, so inevitable a result of the breach of warranty that it must have been within the contemplation of the parties had they contemplated a breach. With special damages pleaded and supported by the evidence and with requests to charge purporting to cover plaintiff's contentions in regard to the measure of damages, the court was justified in assuming that plaintiff adopted the theory that if the special damages were the proximate result of the breach of warranty they were recoverable. The implication from its requests is plain. It is not now in a position to contend that some other rule should have been given."

Reversed and new trial granted.