WESTERN PLASTICS CORPORATION, A CORPORATION, APPELLANT AND CROSS-APPELLEE, V. WESTINGHOUSE ELECTRIC CORPORATION, A CORPORATION, APPELLEE AND CROSS-APPELLANT.

169 N. W. 2d 1

Filed June 13, 1969. No. 37125.

Lyle E. Strom and Fitzgerald, Brown, Leahy, McGill & Strom, for appellant.

Crossman, Barton & Norris, for appellee.

Heard before WHITE, C. J., CARTER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

CARTER, J..

Western Plastics Corporation brought this action against Westinghouse Electric Corporation to recover damages for a breach of warranty of quality covering a 25 horsepower adjustable voltage drive manufactured by Westinghouse and sold to Western Plastics f.o.b. Buffalo, New York. The jury returned a verdict for Western Plastics and against Westinghouse in the amount of $5,686.02. The trial court sustained the motion of Westinghouse for a new trial and Western Plastics has appealed.

Western Plastics is engaged in the business of manufacturing plastic pipe varying in diameter from ½ to 6 inches. Plastic pipe is manufactured by an extrusion process whereby a molten material of heavy consistency is forced through a heated cylinder, through a die, and pulled away through a water cooler after which it maintains its rigid shape and form. The auger-like screw which forces the material through the die was powered by electric motors and belts causing the shaft of the screw to turn. The motor and the means of conveying

the power generated by the motor to the screw are referred to in this record as the drive. The machine to which the power is applied is known in the business as an extruder.

In the early summer of 1961, Western Plastics was using a 25 horsepower high and low voltage U. S. vari-drive on a 3½-inch extruder. It was described as a mechanical drive which Western Plastics desired to replace with an electrical drive because of shaft breakage on the vari-drive and the need for more speed in operating the extruder. It placed an order with Dutton-Lainson Company of Hastings, a representative of Westinghouse, for a 25 horsepower adjustable voltage electrical drive. The order specified a speed range of 215 to 2,500 revolutions per minute in contrast with the vari-drive range of 1,250, the maximum and minimum rates of producing speeds not being shown by the record other than that one witness testified it had a maximum speed of 2,150 revolutions per minute. Westinghouse, through Clifford E. Pickering, advised either a 30 horsepower adjustable voltage drive with a speed range of 175 to 2,500 revolutions per minute, or a 40 horsepower adjustable voltage drive with a speed range of 175 to 3,450 revolutions per minute dependent on certain conditions not important here. The advice of Westinghouse was not accepted and it proceeded to furnish a 25 horsepower adjustable voltage drive, but advised Western Plastics by letter in parts as follows: "We cannot accept responsibility for guaranteed performance of this drive in view of the foregoing horsepower recommendations we feel are required." Western Plastics, through its president, John Lainson, admits the receipt of the letter and full knowledge of the import of its contents before the drive was ordered.

It is the contention of Western Plastics that in purchasing the 25 horsepower adjustable voltage drive from Westinghouse, the latter, in writing, represented and warranted the drive as being suitable for speed adjust-

ment from 218 to 2,500 revolutions per minute at continuous 24-hour per day usage. It is alleged that the drive failed to properly operate and was unable to maintain a stable speed at any rate in excess of 1,400 revolutions per minute. It is further alleged that Westinghouse attempted to correct the defects in the drive without success and that said drive in its defective condition, is wholly worthless. Westinghouse in its answer alleges that it sold Western Plastics a 25 horsepower adjustable voltage drive only after recommending a 30 or 40 horsepower adjustable voltage drive and that Western Plastics, through its president, accepted all responsibility for the 25 horespower drive, as evidenced by a letter by which it refused to guarantee performance of the 25 horsepower drive. Westinghouse further alleges that the difficulties experienced with the 25 horsepower drive were caused by Western Plastics in its application, operation, and maintenance of the drive. Westinghouse also alleges that on August 20, 1964, a settlement of the controversy was had by the parties and that Western Plastics is estopped from denying that a full accord and satisfaction was had. The reply was a general denial.

The equipment was shipped by Westinghouse f.o.b. its Buffalo plant in August 1961. It was received by Western Plastics about September 1, 1961, in a damaged condition. The witnesses primarily involved in the controversy which ensued are the following: John J. Lainson, president of Western Plastics; William G. Phillips, vice president of Dutton-Lainson; Clifford E. Pickering, division specialist and Pacific Coast regional sales manager of Westinghouse; Robert D. Newman, field service engineer for Westinghouse; Harvey B. Crane, electric service supervisor for Westinghouse; Lawrence Merryfield, a district engineer reviewing applications for power equipment for Westinghouse; and Thomas C. Sage, industrial district sales manager for Westinghouse. We shall hereafter refer to these witnesses by their surnames as a matter of convenience.

Lainson testified that the power drive had to maintain a consistent and stabilized speed otherwise the product coming through the extruder would produce a variance in the plastic pipe walls and otherwise produce an unmerchantable product. The necessity for a consistent, stabilized source of power to produce satisfactory plastic pipe is not disputed in this record. Nor is it questioned that any oscillation in the shaft driving the auger-like screw would destroy the effectiveness of the extruder in the production of quality plastic pipe. In other words, anything which would develop an instability of pressure such as loose connections in the wiring or an overloading of the source of power would result in a defective and unmerchantable product.

Upon the receipt of the drive in a damaged condition, Westinghouse was employed to make the necessary repairs to put it in condition to properly operate. Newman came to Hastings, made the necessary repairs, checked the equipment, and determined that it was in proper condition to operate. The drive was thereafter installed by the A.B.C. Electric Company of Hastings.

On or about September 21, 1961, Western Plastics discovered a want of control of the drive. Newman was again called and discovered a loose solder joint of the speed-setting potentiometer which he repaired. The loose joint had damaged the rectifier tubes so that control fuses were blown in starting. These tubes and fuses were replaced and the drive then worked properly on starting at all speeds. Subsequently, after complaint, it was found that the direct current motor had a raised bar that Newman corrected on August 2, 1962. Western Plastics replaced the rectifier tubes in December 1962, which had caused the drive to swing. The swing was thereafter diminished.

On June 15, 1963, Western Plastics reported drive fluctuation due to the overheating of the external incoming line fuse panel. A new fuse panel corrected this difficulty. Drive fluctuations or oscillations continued

and on December 13, 1963, Newman found a loose connection on the speed potentiometer which he repaired. Rectifier and control tubes were replaced and the drive appeared to work satisfactorily. On February 8, 1964, oscillation was again reported. Newman found loose leads in a tube grid circuit which resoldering corrected. Newman stated that the trouble appeared to be in the power amplifier panel where a loose intermittent connection was difficult and expensive to find. A new power amplifier panel was installed on April 1, 1964, at the expense of Westinghouse.

In April 1964, Crane went to the plant of Western Plastics to check out the drive, determine if malfunctions existed, and, if there were, what they were. He tested the drive with an oscillograph. He found by the use of a tachometer that the drive would operate at 1,950 revolutions per minute on the usual load without oscillating and that when that rate was exceeded it began to oscillate. He locked the control at 1,950 revolutions per minute so that the oscillating speed could not be reached. In other words, when the speed of the drive exceeded 1,950 revolutions per minute, the drive lacked sufficient power to operate in the stable manner required to produce merchantable plastic pipe. Crane testified that he discussed the matter with Lainson and informed him that a speed of 1,950 revolutions per minute on load was the limit of the capability of the drive to perform its function properly. Crane further testified that there was no defect in the drive; that 1,950 revolutions per minute was simply the limit of the capability of the drive in performing the work load required of it.

Newman testified that some of the difficulties arose in exterior portions of the equipment used, some were the result of inadequate expert maintenance, and that the drive was ordinarily operated at 2,000 revolutions per minute which exceeded the capability of the drive causing oscillation. He further stated that the drive

would run at 4,000 revolutions per minute when disconnected from the extruder. Crane stated that the limit of 1,950 revolutions per minute was because of the undersized motor and not due to any defect in the equipment. Merryfield testified that the change from the 25 horsepower vari-drive to a 25 horsepower adjustable voltage drive and increasing the speed without changing load characteristics resulted in an undersized motor and the resulting oscillation on reaching the limit of capability. Lainson testified that the drive continued to oscillate when run over 1,400 revolutions per minute. Many complaints and conversations about the drive appear to have been held by Lainson and Newman that were not referred to in the written correspondence received in evidence.

The foregoing is a brief summary of the complaints made by Western Plastics and the actions taken by Westinghouse with respect thereto. Westinghouse billed Western Plastics for the repair work performed by it on the drive except for the replacement of the power amplifier panel on April 1, 1964, and for the services of Crane in testing the drive in April 1964.

The purchase order was for a 25 horsepower adjustable voltage drive to operate at 215 to 2,500 revolutions per minute base speed for application on a plastic extruder. Newman tested the drive without load in early September 1961. He found that it met the specifications which included the attaining of a speed of 2,500 revolutions per minute by application of the 25 horsepower motor. This is a compliance with the representation rating of the drive. The trial court instructed the jury that it must consider the warranty as to horsepower and speed range as a warranty of an unloaded horsepower and speed range. No exception was taken to this instruction. We find no evidence in this record that the drive would not operate without load in accordance with the specifications of the purchase order.

Where there is a contract to sell goods by description,

there is an implied warranty under the statute existing in 1961 that the goods shall correspond with the description. § 69-414, R. R. S. 1943 (Reissue of 1958).

Westinghouse relies on section 69-471, R. R. S. 1943 (Reissue of 1958), which provided at the time of the purchase order in this case, as follows: "Where any right, duty or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by express agreement or by the course of dealing between the parties, or by custom, if the custom be such as to bind both parties to the contract or the sale."

When a seller has expressly refused to warrant the subject matter of a sale in certain particulars, there can be no implied warranty of a character covering those particulars, and such a disclimer of warranty is not voided by the Uniform Sales Act. Kennedy v. Cornhusker Hybrid Co., 146 Neb. 230, 19 N. W. 2d 51, 160 A. L. R. 351.

Westinghouse clearly disclaimed any warranty for performance of the drive if powered by a 25 horsepower motor which it deemed inadequate. The only warranty existing was that the drive would operate without load over a speed range of 218 to 2,500 revolutions per minute and produce 25 horsepower while doing so. The evidence shows no breach of this warranty. Western Plastics urges that Westinghouse warranted the drive to operate at 218 to 2,500 revolutions per minute on load in the manner in which the extruder had been operated in the past. But this is not the contract. It certainly would be most unusual to warrant the horsepower of a motor and the speed at which it would operate regardless of the character of the load.

There is some contention that there were admissions made that justified the submission of the case to the jury. It is contended that Newman admitted that there was an inherent defect in the drive. The difficulty is that the alleged admission did not admit that the defect

existed when it was shipped f.o.b. Buffalo, or whether or not it was due to the in-transit damage, or the failure of the maintenance required to keep the drive properly operating, or the undersizing of the power to properly operate the extruder. Some contention is also made that the efforts of Westinghouse to keep the drive in operating order estopped Westinghouse from asserting a want of liability under its warranty. We find no merit in these contentions for the reason that, after considering the alleged admissions, there is no proof that the defect, if any, which was never found, was due to a breach of any warranty on the part of Westinghouse. As to estoppel, the record shows that Westinghouse generally billed Western Plastics for parts and labor furnished in making the repairs and was generally paid by the latter although a compromise of the amount of these charges was made along with other matters having no relation to the drive.

Lainson testified that the drive was taken out of service in December 1965. On September 22, 1965, he informed Phillips of the continued oscillation of the drive, that he wanted it remedied within 30 days, and threatened suit. Western Plastics called John J. McCarty as a witness. He testified that he was a partner in A.B.C. Electric Company, that he qualified himself as an electrician only through experience, and that he was not an electrical engineer. He testified that at Lainson's request he checked the revolutions per minute and the amperage, etc., on the drive in October 1965. He stated the drive would not exceed 1,420 revolutions per minute without fluctuating and that it was generating about 13.9 horsepower, all without load. Westinghouse moved to strike this testimony as not the best evidence and was overruled. Three more unimportant questions were asked. After another witness had testified, McCarty was called back to the witness stand and clarified some of his previous testimony. Westinghouse then moved to strike the evidence of McCarty because

of want of foundation as to competency that the evidence was too remote. There was no evidence of any kind that the drive tested in October 1965 was in the same condition as when it was purchased. The motion was sustained and Western Plastics assigns this as error.

It is the contention of Western Plastics that the failure of Westinghouse to object to the testimony of McCarty constituted a waiver of objections to it and that the trial court erred in sustaining the motion to strike. The cases cited by Western Plastics hold that a failure to object to the admission of evidence in the trial court precludes one from raising the objection for the first time on appeal. Anderson v. Walsh, 109 Neb. 759, 192 N. W. 328; Kehr v. Kehr, 173 Neb. 532, 114 N. W. 2d 26. But this is not the question before us. While there is a division in the authorities in other jurisdictions, we think the proper rule is: The entertainment of a belated motion to strike testimony, no objection having been previously made thereto, is discretionary with the trial court. Combs v. Owens Motor Co., 121 Neb. 5, 235 N. W. 682; McClellan v. Hein, 56 Neb. 600, 77 N. W. 120; Gran v. Houston, 45 Neb. 813, 64 N. W. 245; Glatstein v. Grund, 243 Iowa 541, 51 N. W. 2d 162, 36 A. L. R. 2d 531; American Workmen v. Ledden, 196 Ark. 902, 120 S. W. 2d 346, 120 A. L. R. 201. We think the evidence was too remote in time and so lacking in foundation that the court did not abuse its discretion in sustaining the motion to strike under the circumstances shown.

In this action to recover for a breach of warranty, the burden of proof is on Western Plastics to show that the drive was defective when it was shipped f.o.b. Buffalo. It must show a basis for relief over and above mere speculation and conjecture. Frame v. Hohrman, 229 Minn. 468, 39 N. W. 2d 881. It must show by such proof that a breach of warranty occurred beyond the scope of the disclaimer of warranty made prior to the purchase. This it has not done. We find no evidence in this record to sustain a finding that a defective condition as

to design and manufacture existed at the time the drive was supplied by Westinghouse. Consequently the evidence will not support a verdict for Western Plastics.

The trial court sustained the motion of Westinghouse for a new trial. Western Plastics appealed and Westinghouse filed a cross-appeal, contending the trial court erred in not granting its motion for a judgment notwithstanding the verdict. Even though we view the evidence in the light most favorable to Western Plastics, which we are required to do, we still find no adequate proof from the record that the 25 horsepower adjustable voltage drive was defective at the time of purchase. The drive was used for 4 years before it was taken out of service. There is no evidence that it was not used during that time for the purpose of producing plastic pipe. We think the trial court erred in granting a new trial rather than a judgment for Westinghouse notwithstanding the verdict. The judgment of the district court granting a new trial is reversed and the cause remanded with directions to enter judgment notwithstanding the verdict.

REVERSED AND REMANDED WITH DIRECTIONS.

SPENCER, J., participating on briefs.